## UNITED STATES v. JAFFE.

### Cr. No. 1786–50.

United States District Court
District of Columbia, Criminal Division.
May 28, 1951.

George Morris Fay, U. S. Atty., William Hitz, Asst. U. S. Atty., Washington, D. C., for plaintiff.

O. John Rogge, Robert H. Goldman and Rogge, Fabricant, Gordon & Goldman, all of New York City and Washington, D. C., for defendant.

MORRIS, Judge.

■ This defendant was charged in an indictment of twenty-six counts with violation of Title 2, United States Code Annotated, Section 192, in that, having appeared before a duly created Sub-Committee of the Committee on Foreign Relations of the United States Senate, he was asked certain questions pertinent to the question then under inquiry by said Sub-Committee, and did refuse to answer said questions. It is not necessary here to discuss several defenses asserted in a motion to dismiss the indictment, as said motion has heretofore been denied by this Court acting through Judge Kirkland, and I do not consider such questions open for further consideration in this case. Upon a plea of not guilty, and jury having been waived, a trial was had upon the merits.

There is no question that the defendant claimed the privilege under the Fifth Amendment to refuse to answer all of the questions involved on the ground that the answers might tend to incriminate him. It is insisted by the Government that the questions here involved are innocent upon their face, and that the defendant was not entitled to refuse to answer them without a showing that such answers would tend to incriminate him. Such showing was not made. The defendant insists that, in the circumstances, there was no duty or burden upon him to make such showing, and that, therefore, he should not have been required to make answers to such questions, and that he is not guilty of contempt in refusing to do so. This is the issue to be determined by the Court.

■ As recently stated by this Court in the case of United States v. Fitzpatrick, D. C., 96 F.Supp. 491, 493, "The power of the Congress to conduct investigations by and through its committees, or otherwise, is one essential to the performance of the legislative function and certain other functions that are committed to it by the Constitution. It derives from ancient origin, and was well recognized in the Parliament of England and the legislative bodies of the several colonies and states before the Constitution was drafted. This power must have latitude to enable the Congress, not only to legislate, but to determine when legislation is not necessary; validity of its inquiry is not measured by the same yardstick as the validity of the legislation which it does enact. So, within its constitutional powers and limitations, the right of Congress to exercise this power of investigation must be upheld by the judicial branch of the Government, and unlawful attempts to frustrate it must be effectively dealt with by the courts. That this has been done with vigor and effect is abundantly shown in the volumes of reported cases which relate to this subject. It is equally the duty of the courts, however, when called upon to uphold and enforce this power of investigation, to determine whether or not a constitutional limitation justifies a witness in refusing to answer a question propounded to him. * * * There is just as heavy a duty upon any organ of the Government, congressional, executive, or judicial, to observe constitutional limitations as to perform diligently and effectively the tasks committed to them by the Constitution and legislation passed pursuant thereto."

■ As also recently stated by this Court in the case of United States v. Raley, D. C., 96 F.Supp. 495, 496, "Obviously, the privilege of refusing to answer questions on the ground that such answers might tend to incriminate a witness may not be used as a subterfuge to avoid giving information to a legally constituted committe or sub-committee of Congress when such information is pertinent to the question being investigated by such congressional body. The privilege may only be asserted when there is reasonable apprehension on the part of the witness that his answers would furnish some evidence upon which he could be convicted of a criminal offense against the United States, or which would lead to a prosecution of him for such offense, or which would reveal sources from which evidence could be obtained that would lead to such conviction, or to prosecution therefor. Chief Justice Marshall, sitting on circuit, in the trial of United States v. Burr, 25 Fed.Cas. 38, at page 40, No. 14,692e, in connection with the claim of privilege by one Willie, secretary to Aaron Burr, said: " 'When a question is propounded, it belongs to the court to consider and to decide whether any direct answer to it can implicate the witness. If this be decided in the negative, then he may answer it without violating the privilege which is secured to him by law. If a direct answer to it may criminate himself, then he must be the sole judge what his answer would be. The court cannot participate with him in this judgment, because they cannot decide on the effect of his answer without knowing what it would be; and a disclosure of that fact to the judges would strip him of the privilege which the law allows, and which he claims. It follows necessarily then, from this statement of things, that if the question be of such description that an answer to it may or may not criminate the witness, according to the purport of that answer, it must rest with himself, who alone can tell what it would be, to answer the question or not. If, in such a case, he say upon his oath that his answer would criminate himself, the court can demand no other testimony of the fact.' "

■■ The very real question then upon which the guilt or innocence of this defendant turns is whether his refusal to answer the questions asked him on the ground that the answers might tend to incriminate him was clearly a subterfuge to avoid giving information to which the Sub-Committee was entitled, or whether there was ground for reasonable apprehension on his part that the answers to such

questions would furnish some evidence upon which he could be convicted of a criminal offense against the United States, or which would lead to a prosecution of him for such offense, or which would reveal sources from which evidence could be obtained that would lead to such conviction, or to such prosecution. While it may be that, in certain circumstances, a witness should explain why an answer to an apparently innocent question might tend to incriminate him in order to avoid the conclusion that he was resorting to subterfuge to prevent giving information which he is required to give and to make clear that he did have reasonable apprehension that the answers to such questions would tend to incriminate him, there can certainly be no such burden upon a witness when the circumstances are such that reasonable apprehension on his part is evident. Moreover, it is well recognized that, once it has become apparent that the answer to a question would expose a witness to the danger of conviction or prosecution, wider latitude is permitted the witness in refusing to answer other questions upon the ground that such answers would tend to incriminate him. For this reason, certain of the questions, which did indeed on their face seem quite innocent, standing alone, might well require an explanation from the defendant to justify his refusal to answer, would not require more than the claim of privilege when associated with other questions which are clearly criminatory, or which in the circumstances reasonably gave rise to apprehension of danger to the witness.

█ The questions involved in the indictment are part of many questions asked of the defendant at the hearing held on June 12, 1950. The defendant was one of many witnesses examined by the Sub-Committee over a period extending from March 8, 1950, through June 28, 1950. These hearings had been the subject of wide publicity, concerning which reference will be made later. Louis Francis Budenz testified as a witness before the Sub-Committee on April 20, 1950. Throughout the testimony of Mr. Budenz repeated references were made to this defendant, from which testimony it was clearly evident that this defendant was considered to be an active advocate of Communism, and Mr. Budenz characterized him as a "Soviet espionage agent" to his knowledge. This defendant's activities in connection with the Amerasia Magazine brought about an indictment in August 1945, in which he and others were charged with a conspiracy to acquire, conceal and have possession and custody of numerous documents of a secret or classified nature. This defendant plead guilty and a fine of $2,500 was imposed on him. All of this resulted in a great deal of publicity at the time, and occasioned subsequently an investigation and report in 1946 by a Sub-Committee of the Committee on the Judiciary, House of Representatives, popularly known as the Hobbs Committee Report, in which, among other things, it was stated, "If it be thought that any one or more of the six [defendants in the Amerasia case] who were originally accused should be further prosecuted on the charge of espionage, it may still be done. [House Report No. 2732, 79th Congress, 2d Session, 1946, page 8. Exhibit E in the instant case.]" While, of course, newspaper articles and comments are not admissible in evidence as proof of the facts contained therein, it is clearly recognized that such published articles are admissible to show comments that may have reasonably caused apprehension to a person that he is in danger of being prosecuted for an offense, and thus justify him in claiming privilege in refusing to answer questions which might tend to incriminate him.[1] The flood of such newspaper publicity for many weeks immediately prior to the testimony of this defendant with reference to his connection with the Amerasia case, his reputed connection with communist activities, and association with persons engaged in furthering communist objectives is abundantly re-

---

1. Judge Learned Hand in United States v. Weisman, 2 Cir., 111 F.2d 260, at page 262; Judge Denman in Alexander v. United States, 9 Cir., 181 F.2d 480, at page 484.

vealed in exhibits filed in the instant case.[2] It was revealed in such published articles that a federal grand jury in the Southern District of New York was at that time investigating action of the Government in connection with the prosecution and disposition of the defendants in the Amerasia case, and the testimony in the instant case shows that Mr. Robert Morris, Assistant Counsel for the Sub-Committee before which this defendant was called to testify, did appear as a witness before such grand jury. Among the published articles above referred to is one in which Senator McCarthy, the author of the Senate Resolution pursuant to which the Sub-Committee was conducting the investigation, is quoted as having urged the Sub-Committee to subpoenae this defendant and other persons, and saying, "As to Field, Browder, Jaffe and Stachel—I'd either make them indict themselves or perjure themselves".[3]

With respect to the various persons, concerning whom this defendant was asked many of the questions involved in the indictment, Mr. Edward P. Morgan, Counsel for the Sub-Committee, who conducted the interrogation of this defendant before that Sub-Committee, testified in substance in the instant case that, from his long experience in the Federal Bureau of Investigation as Supervisor of Communist Activities, and his investigations as Counsel for the Sub-Committee, he had information that they were in one way or another associated with this defendant, that many of them were Communists or had communist leanings, and that he considered them to be links in many chains that had relationship with each other. It is not to be doubted from the testimony of Mr. Morgan that the Sub-Committee actually knew, or easily could have known, from their consultations with its counsel the essential

2.

| Exhibit | Date | Newspaper |
|---|---|---|
| B | 4/20/50 | New York Journal American |
| C(4) | 4/23/50 | " |
| C(5) | 4/21/50 | " |
| D(2) | 3/16/50 | " |
| D(3) | 4/7/50 | " |
| G(1) | 5/23/50 | " |
| H(7) | 6/15/50 | " |
| C(1) | 4/21/50 | New York Herald Tribune |
| H(2) | 6/9/50 | " |
| H(5) | 6/17/50 | " |
| C(2) | 4/21/50 | The New York Times |
| D(5) | 5/5/50 | " |
| F(1) | 5/23/50 | " |
| H | 6/10/50 | " |
| H(4) | 6/13/50 | " |
| C(8) and D | 5/1/50 | New York World-Telegram |
| D(1) | 5/18/50 | " |
| F | 5/26/50 | " |
| G(2) and G(3) | 6/9/50 | " |
| H(1) | 6/10/50 | " |
| H(3) | 6/12/50 | " |
| C | 4/21/50 | The Daily News |
| D(7) | 6/9/50 | The Post Home News |
| C(7) | 3/7/50 | The Hartford Times |
| C(3) | 4/21/50 | Boston Record |
| H(6) | 6/16/50 | Knoxville News Sentinel |
| G | 5/23/50 | Tulsa World |
| C(6) | 5/4/50 | Worcester Gazette & Post |
| D(6) | 6/9/50 | Chicago Tribune |
| D(8) | | A booklet entitled "The Shocking Story of the Amerasia Case," published by Scripps-Howard newspapers. |

3. Exhibit C-5, 4/21/50, New York Journal American.

information possessed by that able and experienced investigator, upon which were based the questions involved in this indictment. It is further to be noted that many of the questions asked this defendant, and which he declined to answer on the ground that such answers would tend to incriminate him were so obviously incriminating on their face that they were not made the subject of contempt proceedings, as were the questions set forth in the twenty-six counts of the indictment. It is of significance also that, during the course of the questioning of this defendant, his attention was directed to the provisions of Section 3486, Title 18, United States Code, which reads as follows: "No testimony given by a witness before either House, or before any committee of either House, or before any joint committee established by a joint or concurrent resolution of the two Houses of Congress, shall be used as evidence in any criminal proceeding against him in any court, except in a prosecution for perjury committed in giving such testimony. But an official paper or record produced by him is not within the said privilege."

It can hardly be doubted that there was then a misapprehension that this provision afforded such immunity to a witness testifying that he could be compelled to make answers to pertinent questions, even if incriminating. The defendant, upon advice of his counsel, took the position that the statute referred to did not provide such complete immunity from prosecution that it supplanted the right afforded him under the provisions of the Fifth Amendment. This is, of course, what was decided by the United States Supreme Court in the case of Counselman v. Hitchcock, 142 U.S. 547, at page 564, 12 S.Ct. 195, at page 198, 35 L.Ed. 1110, at page 1114. In considering Section 860 of the Revised Statutes, which, in substantially the same terms as the section relating to witnesses before congressional committees, provided like immunity to witnesses in judicial proceedings, the Court said:

"That section must be construed as declaring that no evidence obtained from a witness by means of a judicial proceeding shall be given in evidence, or in any manner used against him or his property or estate, in any court of the United States, in any criminal proceeding, or for the enforcement of any penalty or forfeiture. It follows that any evidence which might have been obtained from Counselman by means of his examination before the grand jury could not be given in evidence nor used against him or his property in any court of the United States, in any criminal proceeding, or for the enforcement of any penalty or forfeiture. This, of course, protected him against the use of his testimony against him or his property in any prosecution against him or his property, in any criminal proceeding, in a court of the United States. *But it had only that effect. It could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him or his property, in a criminal proceeding in such court. It could not prevent the obtaining and the use of witnesses and evidence which should be attributable directly to the testimony he might give under compulsion, and on which he might be convicted, when otherwise, and if he had refused to answer, he could not possibly have been convicted.*

*"The constitutional provision distinctly declares that a person shall not 'be compelled in any criminal case to be a witness against himself,' and the protection of section 860 is not co-extensive with the constitutional provision.*" (Emphasis supplied.)

While Section 860 of the Revised Statutes has since been repealed, the determination that its provisions afforded only partial immunity has been considered by the Supreme Court to be equally applicable to Section 3486, Title 18, United States Code,[4] which relates to witnesses before congressional committees. That this is clearly so was subsequently recognized by the Sub-Committee in its report, and in that connection it made recommendation

4. United States v. Bryan, 339 U.S. 323, at page 335, 70 S.Ct. 724, 94 L.Ed. 884.

that an adequate statute of immunity be formulated and adopted.[5]

 In the light of the setting and all of the facts and circumstances surrounding the questioning of this defendant, which have been briefly alluded to above, it does not seem in the slightest unreasonable that the defendant would have very grave apprehension that he was in danger of prosecution for an offense against the United States, and that in those circumstances he ought not to be required to furnish information upon which he could be prosecuted or convicted, or which would reveal sources from which evidence could be obtained that would lead to such prosecution or conviction. Of course, the defendant is not entitled to assert privilege to avoid giving information respecting any offense for which he could not be prosecuted or convicted, and, therefore, he was in no danger with respect to the offense for which he had previously been indicted, plead guilty and fined; nor was he in any danger respecting any offense for which he could not be prosecuted by reason of the statute of limitations. Clearly, however, his previous indictment and punishment would not be a bar to prosecution for violation of Section 794(a) (b) (c) and (d), Title 18, United States Code, "Gathering or delivering defense information to aid [a] foreign government", which is not the offense for which he has already been put in jeopardy. Certain of the offenses provided in that Section are not barred by the statute of limitations,[6] and others are subject to a statute of limitations of three years,[7] but, as to the three-year statute of limitations, Section 3287, Title 18, United States Code, provides that, "When the United States is at war the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, or (2) committed in connection with the acquisition, care, handling, custody, control or disposition of any real or personal property of the United States, * * * shall be suspended until three years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress."

The Court takes judicial notice that the President proclaimed termination of hostilities of World War II at 12 o'clock noon of December 31, 1946.[8] It would thus appear that the three-year statute of limitations would not begin to run until December 31, 1949, and would not bar prosecution until December 31, 1952. It can hardly be doubted that, under the statements and charges made by some of the witnesses at the hearings of the Sub-Committee, the witness could reasonably apprehend danger of prosecution for violation of the Smith Act,[9] or conspiracy to violate the Smith Act.[10] See Blau v. United States, 340 U.S. 159, 71 S.Ct. 223.

 That the Congress should have the power and means to secure any information which it needs in the public interest is certainly beyond question. Certainly there should be no barrier which would prevent the Congress from obtaining such information, but also certainly this information should not be had at the expense of the American tradition that no one should be prosecuted for or convicted of crime upon confessions coerced from him, or testimony which he has been compelled to give. There are ample ways within that tradition, with diligent investigation, upon testimony of others, and voluntary statements of the accused to bring guilty persons to justice. And furthermore, it clearly lies within the power of Congress, when information is needed by the Congress for its constitutional purposes, to secure that information, even though it would reveal that the witness is guilty of a criminal offense, by providing complete immunity to such witness when it is deemed that the information sought is relatively more important in the public inter-

---

5. Recommendation IV, Report of Committee on Foreign Relations pursuant to S. Res. 231, p. 169.
6. Section 3281, Title 18, U.S.C.
7. Section 3282, Title 18, U.S.C.

8. Proclamation No. 2714, 12 F.R. 1, Section 601, Appendix to Title 50 U.S.C.A., War and National Defense.
9. Section 2385, Title 18, U.S.C.
10. Section 371, Title 18, U.S.C.

est than punishment of the witness for the crime. The Congress has done this with respect to numerous administrative agencies of the Government, and could certainly do so with respect to witnesses before its own committees. Such safeguards as Congress deems proper could be provided against any improvident use of such immunity. Indeed, as already mentioned, the Sub-Committee conducting the hearings involving this defendant has recommended such course of action, which would avoid the present conflict between congressional power and constitutional limitation.

I cannot reach any other conclusion but that the defendant had reasonable ground for apprehension that the testimony sought from him would expose him to prosecution for or conviction of a crime against the United States, and, having claimed the privilege granted to him by the Fifth Amendment to the Constitution, he should not have been required to give such testimony, and, therefore, it is the judgment of the Court that, in refusing to do so, he is not guilty of contempt.