## PORETTO v. UNITED STATES.
### No. 13818.

United States Court of Appeals
Fifth Circuit.

April 22, 1952.

Eugene Stanley, Wm. C. Orchard, New Orleans, La., for appellant.

John N. McKay, U. S. Atty., New Orleans, La., for appellee.

Before HOLMES, RUSSELL, and RIVES, Circuit Judges.

HOLMES, Circuit Judge.

A special committee to investigate organized crime in interstate commerce was created by resolution of the United States Senate. The resolution, among other things, directed the committee to make a complete investigation of whether organized crime utilizes the facilities of interstate commerce or otherwise operates in interstate commerce in furtherance of any transactions in violation of the laws of the United States or of the state in which the transactions occur; and, if so, the manner and extent to which, and the *identity of the persons,* firms, or corporations by which, such utilization is being made, what facilities are being used, and whether or

not organized crime utilizes such interstate facilities or otherwise operates in interstate commerce for the development of corrupting influences in violation of laws of the United States or of any state.

The appellant, Joseph Poretto, appeared as a witness before said special committee, and refused to answer a number of questions propounded to him by the committee, assigning in each instance, as his reason for refusal, that an answer would tend to incriminate him. On March 28, 1951, the appellant was indicted in 26 counts for contempt of the United States Senate, in violation of Section 192, Title 2, of the United States Code Annotated. A motion to dismiss the indictment was overruled, a plea of not guilty entered, a trial by jury waived, and a trial had before the court, which found appellant not justified on 12 counts in his claim of privilege against self-incrimination, but not guilty on the other 14 counts of the indictment. The counts upon which appellant was indicted, the questions that he refused to answer, and the findings of the court thereon, were as follows:

### Count 1.

Have you ever been to Houston? Not guilty.

### Count 2.

Are you under indictment? Guilty.

### Count 3.

Now then, sir, what business are you in now? Not guilty.

### Count 4.

Have you ever been in Chicago? Not guilty.

### Count 5.

Now sir, have you ever been connected with the Southern News Publishing Company? Guilty.

### Count 6.

In 1946, did you leave Houston and come to New Orleans and start the Southern News Publishing Company? Not guilty.

### Count 7.

Did you send five thousand dollars to Trans-America in 1946 for a news service? Not guilty.

### Count 8.

Did you send five thousand dollars to Trans-America in Chicago in 1946 for any purpose? Not guilty.

### Count 9.

Have you ever heard of Trans-America? Not guilty.

### Count 10.

Did you have any dealings with Western Union in 1946? Guilty.

### Count 11.

Were you not billed by Western Union for furnishing wire service in 1946? Guilty.

### Count 12.

Did you file an injunction, or was an injunction filed on your behalf on August 23, 1946, entitled "Joseph Poretto vs. Herve Racivitch, District Attorney for the Parish of Orleans?"

### Count 13.

Did you not state in the petition filed on August 23, 1946, in part: That Joseph Poretto was in the business of the Southern Publishing Company and called for the return of certain teletype printing machine, teleprinter, and other articles set out; "that on August 20, 1946 the police of the City of New Orleans raided the premises at 204 Liberty Building, on St. Charles Street in this City and received the teletype writing machine and teletype printing machine, which is a part of and was connected to a telegraph press wire operating through Brooklyn, New York City, Chicago, and St. Louis, to New Orleans?" Guilty.

### Count 14.

Is it not true that at the time you had four employees, namely, Louis Steincamp, Joseph Travoto, Ralph Emory, and Anthony Carillo? Guilty.

### Count 15.

Do you know Ralph Emory? Guilty.

**Count 16.**

Is it not true that he is from Cicero, Illinois? — Not guilty.

**Count 17.**

Do you know where he is now? — Not guilty.

**Count 18.**

Did you ever know him? — Guilty.

**Count 19.**

Have you ever heard of the Interstate Press Wire Service? — Guilty.

**Count 20.**

Is it not true that you stated that in connection with the Interstate Press Wire Service furnished you for accumulating news necessary for publication, leased same from Western Union Company, that you accumulated machines to the value of Fifteen hundred dollars? — Guilty.

**Count 21.**

Did you ever do any business at 204 Liberty Building, 315 St. Charles Street? — Guilty.

**Count 22.**

Do you know Carlos Marcello? — Not guilty.

**Count 23.**

Do you know Anthony Marcello? — Not guilty.

**Count 24.**

Do you know John Fogarty? — Not guilty.

**Count 25.**

Have you ever transacted any business with Fogarty? — Not guilty.

**Count 26.**

Is it not true that in December of 1946 the organization with which you were associated, the Southern News Publishing Company, merged with the Fogarty Daily Press operation? — Not guilty.

The appellant did not voluntarily appear as a witness before the committee, and the testimony that he gave was under compulsion. He did not waive his privilege against self-incrimination by allegations verified by him in 1946 in prior suits. The constitutional privilege attaches to the witness in each particular case in which he is called upon to testify, without reference to his declarations at some other time or place or in some other proceeding. New federal criminal laws have been enacted in the interim between 1946 and 1951. New situations have arisen; new grounds for apprehension against self-incrimination confronted the appellant. His situation was not that of a defendant taking the stand in a criminal case. The defendant in a criminal prosecution against himself cannot be compelled to take the witness stand; but, if he voluntarily does so, he waives the privilege against self-incrimination by the mere act of offering himself as a witness in his own behalf. An ordinary witness, such as appellant, has no choice; he is compelled to appear as a witness, be sworn, and take the stand. As stated by the Supreme Court, the waiver of the privilege against self-incrimination is not lightly to be presumed. Smith v. United States, 337 U.S. 137, 150, 69 S.Ct. 1000, 1007, 93 L.Ed. 1264. See also Glasser v. United States, 315 U.S. 60, 69, 70, 62 S. Ct. 457, 464, 86 L.Ed. 680.

The 12 questions in the counts on which appellant was convicted were interspersed with 14 others that he was adjudged not guilty of refusing to answer; and the entire 26 in the indictment against him were imbedded in an extended examination of him as a witness at a hearing which was concluded by the Chairman telling him that he appeared to be one of the worst characters that had appeared before the committee. This hearing was preceded by two weeks or more of newspaper publicity about Poretto as a member of a national racket gang and other criminal organizations, together with much prominence about his private life. The Chairman also read to the witness a report about his connections with a so-called Chicago mob and about his having attempted to set up a bootleg wire service in Houston, Texas, "but that you were run out of there"; about his connections with Trans-America Wire Service and certain other people, all or most of whom "are well known criminal

characters," and that "your place got raided" and "Mr. Fogarty's place got raided," and "after that you and he went into business together." When appellant refused to answer the question contained in count 2, the Chairman said: "Well, if you are under indictment you have already taken one step toward incriminating yourself. That is a public record."

 It is well settled that an indictment is not evidence against the defendant, and does not affect the presumption of innocence that the law throws around him; it is not a step taken by the defendant, but a presentment made against him by the grand jury. The record also shows that state and federal district attorneys, and law enforcement officers, were present at the hearing. None of these facts was calculated to allay the appellant's fear of self-incrimination; on the contrary, the imminent danger of his position was such as to generate in his mind the thought that he might be arrested before he left the room if he gave the wrong answer or made a false procedural step. Note the deft questioning of the examiner, Mr. Rice:

"Do you assert your privilege because you are under indictment?" Mr. Poretto: "I refuse to answer on the grounds that I may tend to incriminate myself." Mr. Rice: "Are there any special circumstances connected with that situation which give you the right to assert the privilege?" Sensing the danger, his attorney, Mr. Flannagan, interrupts: "Mr. Chairman, I don't know. He says 'that situation,' but he didn't explain any situation." Mr. Rice: "Yes, he has a situation in mind which will incriminate him. If he doesn't, he must answer." Mr. Flannagan: "Yes, his situation would be based on what you have." Mr. Rice: "The question is: Has he ever been arrested? If he answers that, he takes the position that it will incriminate him of another offense. This other offense is what I am driving at. Now do you understand that? * * * How long ago did the transaction occur that you base your refusal to answer this question on?" Mr. Flannagan: "Mr.

Chairman, I don't believe that is a fair question." The Chairman: "How long ago did something happen which makes him afraid any testimony now would incriminate him?"

Clearly the purpose of this examination was to prize open the mind of this witness and get at some other offense in addition to the one for which he had been arrested. If, as Mr. Rice said, the witness had "a situation in mind" that would incriminate him, this other offense was what he was driving at; he wanted the mind of the witness to be prized ajar just enough to give him a clue to this other offense, disregarding the fact that the witness had refused to admit that he was under indictment or had been arrested. While being interrogated, appellant knew what the Chairman was reported to have said about him and his association with Carlos Marcello, the latter having been proclaimed in a newspaper article as Crime Czar and head of the Mafia. This article, which was available to appellant, further stated: "Senator Kefauver of Tennessee is the only man so far who has had the courage to beard this gang of criminals."

 The more guilty the appellant, the more reason he had to fear that his answers might incriminate him; and if he was innocent, he still had ample grounds to fear that he might be unjustly convicted. His name was connected in newspaper articles with big racketeers and strongarm crime. Advance investigators of the committee prepared a "splendid report on Crescent City Crime," indicating that New Orleans had at least an interstate tie-in with other cities. While newspaper articles are not admissible as proof of the facts stated therein, they are admissible to show comments that reasonably may have caused apprehension to a person that he was in real danger of being prosecuted for an offense, and may justify him in refusing to answer questions on the ground that his answers might incriminate him. Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118; United States v. Weisman, 2 Cir., 111 F.2d 260, 262; Alexander v. United States, 9 Cir., 181 F.2d 480, 484; Estes v. Potter, 5 Cir., 183 F.2d

865, certiorari denied, 340 U.S. 920, 71 S.Ct. 356, 95 L.Ed. 664; United States v. Jaffe, D.C., 98 F.Supp. 191.

██ Questions taken out of their context may seem harmless on their face; but, to a notorious violator of the criminal laws, an answer to any one of them may seem fraught with clues to proof of illegal activities for which he might be prosecuted and convicted. The privilege extends not only to answers that would support a conviction, but to those that would furnish a link in the chain of evidence necessary to convict the witness of a federal crime. It is not perfectly clear to us that the witness in this case was mistaken and that the answers could not possibly have incriminated him. Hoffman v. United States, supra. On the contrary, we are convinced that appellant was confronted with a very real danger of self-incrimination or the commission of perjury unless he refused to answer the questions propounded to him. This strong dilemma in a desperate case left him no recourse for protection except the Fifth Amendment, the palpable purpose of the questions being to identify him as a criminal.

The resolution authorizing the investigation expressly avowed that its purpose was to investigate crime and *identify* the criminals. The committee's trial examiner stated that Poretto had a situation in mind which would incriminate him, and that this offense was what he was "driving at"; so he asked if Poretto was under indictment, if he had ever been arrested, and "if he answers that, he takes the position that it will incriminate him of another offense. This other offense is what I am driving at. [Turning to the witness, he says] Now, do you understand that?" The witness understood, probably better than anyone in the room, that this was one of a series of questions leading up to a situation in his mind that would incrimi-

nate him. The next question was, "How long ago did this transaction occur that you base your refusal to answer on," which was the same as asking when did this second offense occur; and if he had answered that, he would have been asked, "where?" The Chairman explained: "How long ago did something happen which makes him afraid any testimony now would incriminate him?" It was apparent that this "something" was a crime, and that they wanted Poretto to reveal the details of it bit by bit; not a crime committed by someone else, which would have been a proper subject of inquiry, but a crime that would incriminate Poretto, the witness, out of his own mouth, a crime which the witness had in mind that would incriminate him. Two crimes, in fact, were postulated, one for which he had been indicted or arrested, the other a situation which he had in mind that would incriminate him, probably an offense for which he had not been indicted.

██ This probing of the mind of a witness whose business, allegedly, is organized crime on a nationwide scale is not permissible under the Fifth Amendment by a legislative body any more than by a judicial tribunal. See United States v. Burr, 25 Fed.Case No.14,692e, pages 38, 40, wherein Chief Justice Marshall says that if the answer may or may not incriminate the witness and he says upon his oath that it would, "the court can demand no other testimony of the fact." In Foot v. Buchanan, C.C., 113 F. 156, 161, the court said: "Where there is a series of questions, the examiner cannot 'pick out one, and say, if that be put, the answer will not criminate him.'" See also United States v. Rosen, 2 Cir., 174 F.2d 187, 192.

The judgment appealed from is reversed, and a judgment of acquittal rendered here for appellant.