ANTHONY SANDRELLI *vs.* COMMONWEALTH.

Suffolk. November 10, 1960. — February 20, 1961.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE, & CUTTER, JJ.

*Constitutional Law,* Self incrimination, Due process of law. *Contempt. Evidence,* Of self incrimination, Competency, Relevancy and materiality, Hearsay. *Error,* Whether error harmful. *Witness,* Self incrimination, Contempt. *Error, Writ of.*

In a contempt proceeding against a witness for refusing to answer questions as to which he had invoked his privilege against self incrimination, it was proper to refuse a ruling requested by the witness that he could not be held in contempt unless it was "perfectly clear" in the circumstances that the questions "could have been answered with entire impunity": the correct rule is that a witness is not entitled to refuse to answer questions by reason of his privilege unless it appears to the court that there is reasonable ground to apprehend real danger to him in answering. [133–136]

A witness invoking his privilege against self incrimination in refusing to answer seemingly harmless questions is entitled to show circumstances indicating reasonable ground to apprehend real danger to him in answering. [136]

Error in a blanket exclusion of all evidence along certain lines as inadmissible at a hearing by a judge was not cured by the facts that the party offering the evidence was allowed to bring the substance of some of it to the judge's attention by references thereto in argument and that the judge stated that he was "taking notice" of a record so excluded and would "consider [its contents] in determining the issue." [137]

In a proceeding to adjudge in contempt one who had been summoned
before a grand jury as a witness in connection with a murder and who
had invoked his privilege against self incrimination in refusing to an-
swer certain questions, a transcript of proceedings before a judge in
which the witness had been instructed as to his rights and duties as such,
including his privilege, would not be relevant to show reasonable ground
to apprehend real danger to him in answering the questions, but he
would be entitled to introduce as relevant on that issue certain evidence
as to a radio broadcast and public statements by law enforcement offi-
cers concerning the crime, certain newspaper articles though technically
they were hearsay, certain evidence about the ownership of a restaurant
having some connection with the crime, and the witness's probation
record.   [137–141]

On a writ of error to reverse a judgment of criminal contempt against a
witness for refusing to answer questions as to which he had invoked his
privilege against self incrimination, sufficient evidence is to be con-
sidered to permit a determination whether in the contempt proceeding
the alleged contemnor was afforded an adequate opportunity to show
circumstances supporting the assertion of his privilege.   [141–143]

PETITION for a writ of error filed in the Supreme Judi-
cial Court for the county of Suffolk on March 9, 1960.

The case was reserved and reported by *Spalding, J.,*
without decision.

*Manuel Katz,* for the petitioner.

*John T. McNaughton, (Richard S. Kelley,* Assistant Dis-
trict Attorney, with him,) for the Commonwealth.

SPALDING, J.   On the morning of November 12, 1959, the
bullet-riddled body of one Joseph DeMarco was found in a
dump in Everett.   Shortly thereafter, the district attorney
for the Northern District commenced an investigation of
the killing, and summoned several persons, including the
petitioner, to appear before the grand jury.   On November
25, 1959, the petitioner came before the grand jury, and,
without invoking any privilege, refused to answer any ques-
tions other than to state his name and address.   He was
then taken before a judge of the Superior Court, who in-
structed him as to his rights and duties as a witness, in-
cluding the privilege against self incrimination.

On November 30, 1959, the petitioner went before the grand jury again and refused to answer certain questions[1] on the ground that they would incriminate him. On December 9, 1959, the grand jury presented to another judge of the Superior Court, who will be referred to hereinafter as the judge, a petition requesting him to direct the petitioner to answer these questions and, in the event that he persisted in his refusal, to issue an order to him to show cause why he should not be adjudged guilty of criminal contempt. The judge ordered the petitioner to answer the questions. The petitioner, however, went before the grand jury again and refused to answer all of the questions, except two.[2]

The judge thereupon issued an order, returnable on December 14, 1959, for the petitioner to show cause why he should not be adjudged in contempt. At the hearing on December 14, the petitioner moved that the transcript of the hearing before the first judge held on November 25, 1959, be ''made part of this proceeding'' but the motion was denied. After proof, through a stenographer, of the petitioner's refusal to answer the questions put to him before the grand jury, the Commonwealth rested.

The petitioner called as a witness the district attorney, who testified that on December 7, 1959, he appeared on a radio broadcast before a panel of ''newscasters'' and answered questions put to him by the panelists concerning the grand jury investigations of the DeMarco slaying. He was then asked a series of questions as to whether on that occasion he had made certain statements about the case. All of these questions were excluded, subject to the petitioner's

---

[1] These were: ''a. Will you tell us, sir, if you are acquainted with the young lady, approximately twenty years old, who goes under the name of Mickey Taylor?  b. Now, sir, are you acquainted with a young lady, approximately eighteen years old, who goes under the name of Carolyn Diabo?  c. Tony, were you born on August 26, 1908?  d. Did you know a man by the name of Peter Jordan?  e. Will you tell us what time it was on the 11th or 12th that Joseph Angie DeMarco arrived at your restaurant, the Coliseum, at 144 Hanover Street?  f. Now in regard to the early A.M. hours of November 12, 1959, do you know what time Joseph Angie DeMarco left the Coliseum?  g. Now, sir, directing your attention to November 11, that is the holiday, and November 12, 1959, will you tell us whether or not you were in the city of Boston, Mass.?  h. Now, sir, will you tell us whether or not you are in the city of Cambridge, Mass. today?''

[2] The petitioner answered questions ''c'' and ''h.''

exceptions. The petitioner in each instance attempted to make an offer of proof but was not permitted to do so. To each refusal he excepted. Questions were also put by the petitioner to an assistant district attorney whether he had made public statements concerning the true ownership of the Coliseum Restaurant, and the whereabouts of Carolyn Diabo and "Mickey" Taylor on the night of November 11 or the early morning of November 12. These questions and attempted offers of proof were disallowed, subject to the petitioner's exceptions. Questions to the secretary of the Boston licensing board as to who were, according to the board's records, the officers and stockholders of the Coliseum Restaurant, and as to complaints made with respect to the liquor license, were also excluded subject to the petitioner's exceptions. Offers of proof touching these questions, however, were permitted. The petitioner unsuccessfully attempted to introduce the following: newspapers containing articles discussing the case and the investigation; a tape recording of the district attorney's radio broadcast on December 7, 1959; and the petitioner's record from the office of the commissioner of probation. The judge, nevertheless, examined the record and stated that he was "taking notice" of it and would have its contents in mind as facts which he would "consider in determining the issue."

The judge found the petitioner guilty of contempt and imposed a sentence of one year in the county jail. Numerous requests for rulings were presented, some of which were denied, subject to the petitioner's exceptions.

Contending that, for various reasons, the judgment of contempt was erroneous, the petitioner brings this petition for a writ of error. At the hearing before the single justice the petitioner offered the following evidence: (1) a transcript of the evidence in the Superior Court; (2) a collection of excerpts from various newspapers; (3) a typewritten transcription of a tape recording of a radio broadcast on December 7, 1959, in which the district attorney for the Northern District was interviewed by certain members

of the press; (4) photostats of the petitioner's probation record together with a pamphlet explaining the abbreviations used in the record; and (5) a transcript of the proceedings before the first judge on November 25, 1959. The single justice admitted all of this evidence de bene and reported the case without decision to the full court to "determine whether the foregoing evidence was admissible, in whole or in part, and whether, on the basis of the record, the stipulated facts, and such evidence as the full court may deem to be admissible, there was any error in the judgment of the court below."

1. The petitioner's thirteenth request asked for a ruling that the "court cannot adjudge the accused in contempt unless it is perfectly clear from a careful consideration of the questions propounded, in the light of the circumstances disclosed, that they could have been answered with entire impunity." The judge denied the request and ruled that the "court must see from the circumstances of the case and the nature of the evidence which the witness is called to give that there is *reasonable ground* to apprehend danger to the witness from his being compelled to answer" and that there must be "real or substantial danger that the answers . . . would lead to a charge of crime or to the securing of evidence to support a charge of crime" (emphasis supplied).

The ruling of the judge was in accordance with the principles set forth in *Commonwealth* v. *Joyce,* 326 Mass. 751, where the subject was fully discussed with ample citation of the authorities. Unless we are to overrule or modify our holding in the *Joyce* case, the challenged ruling must be upheld. The rule enunciated in the *Joyce* case was the same as that approved by the Supreme Court of the United States in *Mason* v. *United States,* 244 U. S. 362, decided in 1917. Indeed, the *Joyce* opinion relied on the *Mason* case to a considerable extent and quoted from it with approval. In asking us to reëxamine the *Joyce* case, the petitioner directs our attention to *Hoffman* v. *United States,* 341 U. S. 479, decided in 1951, a few months after our decision in the

*Joyce* case. In the *Hoffman* case it was held that the witness invoking the privilege cannot be compelled to answer unless it is " 'perfectly clear [to the court], from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] cannot possibly have such tendency' to incriminate" (page 488). Although the court in the *Hoffman* case did not purport to modify or overrule the *Mason* case (on the contrary, that case was cited with apparent approval) there can be little doubt that the rule set forth in the *Mason* case has been substantially modified. Confirmation for this view may be found in the per curiam reversals of *Greenberg* v. *United States*, 343 U. S. 918, and of *Singleton* v. *United States*, 343 U. S. 944, and in decisions by courts of appeals. See *United States* v. *Coffey,* 198 F. 2d 438 (3d Cir.); *Kiewel* v. *United States,* 204 F. 2d 1, 8 (8th Cir.), concurring opinion of Sanborn, J.; dissenting opinion of Lumbard, J., in *United States* v. *Courtney,* 236 F. 2d 921 (2d Cir.). See also 53 Col. L. Rev. 275.

This court has always carefully protected the rights of those invoking the privilege against self incrimination. See *Emery's Case,* 107 Mass. 172; *Commonwealth* v. *Prince,* 313 Mass. 223; *Jones* v. *Commonwealth,* 327 Mass. 491. And an attempt to weaken the privilege by legislation has met with our disapproval. See *Opinion of the Justices,* 300 Mass. 620. We shall continue to preserve this privilege so long as it is part of our law. But, with due deference to the Supreme Court of the United States, we decline to adopt the "perfectly clear" rule of the *Hoffman* case. That rule is a departure from the prior decisions of that court and from what has generally been regarded by most courts and commentators as the correct rule. That rule was stated one hundred years ago in the leading case of *The Queen* v. *Boyes,* 1 B. & S. 311, in which Cockburn, C.J., said, at pages 329–330, "[T]o entitle a party called as a witness to the privilege of silence, the Court must see, from the circumstances of the case and the nature of the evidence which the witness is called to give, that there is reasonable.

ground to apprehend danger to the witness from his being compelled to answer. . . . [T]he danger to be apprehended must be real and appreciable, with reference to the ordinary operation of law in the ordinary course of things — not a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct." This language was quoted with approval by a unanimous court in *Mason* v. *United States,* 244 U. S. 362, 365–366. The "perfectly clear" rule of the *Hoffman* case, as interpreted by later decisions, comes very close — if it does not in fact do so — to making the witness invoking the privilege the sole judge of whether the question will incriminate. This has never been the law, as even the *Hoffman* case recognizes. See 341 U. S. 479, 486. It is for the court to say whether the silence of the witness is justified. And in making this determination, the court must have something more than the say-so of the witness. While the law does not permit the witness to be the sole judge of the incriminating character of the question, it does not, on the other hand, require him to prove the danger that the privilege was designed to protect. The legal solution of this difficulty has been well stated in *United States* v. *Weisman,* 111 F. 2d 260, where it was said by L. Hand, J., at page 262, "Obviously a witness may not be compelled to do more than show that the answer is likely to be dangerous to him, else he will be forced to disclose those very facts which the privilege protects. Logically, indeed, he is boxed in a paradox, for he must prove the criminatory character of what it is his privilege to suppress just because it is criminatory. The only practicable solution is to be content with the door's being set a little ajar, and while at times this no doubt partially destroys the privilege, and at times it permits the suppression of competent evidence, nothing better is available." We are convinced that the rule of the *Joyce* case (real danger rather. than imaginary danger) is the better one and we are not disposed to modify it. See Wigmore on Evidence (3d ed.)

Sandrelli v. Commonwealth.

§ 2271; McCormick on Evidence, § 129;[1] Maguire, Evidence of Guilt, § 2.05; Morgan, Basic Problems of Evidence, 134–137; Rule 24 of Uniform Rules of Evidence; Rule 202 of Model Code of Evidence. See also Note, 70 Harv. L. Rev. 1454.

The petitioner's thirteenth request was rightly denied.

2. We turn now to the evidence which was excluded by the trial judge. While some of this evidence may have been inadmissible in the form in which it was offered,[2] it is apparent that the judge, in excluding all of it and in denying the offers of proof, regarded the evidence in its entirety as substantively inadmissible. We are of opinion that this was error. Doubtless some questions put to a witness may be incriminating on their face. But that is not true of all questions. Many questions, seemingly harmless on their face, may in a particular setting be harmful. If, as we hold, a witness cannot be the judge of whether the question is incriminating and must open the door enough to enable the court to determine its criminatory nature, then he ought, in fairness, to have the right to show the setting and circumstances which might make the question dangerous. The propriety of the claim of privilege cannot be determined in a vacuum. The prior activities of the witness, the persons with whom he consorts, and his criminal record, if any, may shed some light on whether a question, seemingly harmless, may be criminatory. Of course, to sustain a claim of privilege, the expected answer need not be such as to support a conviction for crime; it is enough if the answer would furnish a link in the chain of evidence needed for such conviction. *Jones* v. *Commonwealth*, 327 Mass. 491, 496–497.

---

[1] As Professor McCormick said in discussing the *Hoffman* case, "Fortunately, state courts which regard this change of view as unwise are free to adhere to the earlier and, it is submitted, more balanced and expedient attitude."

[2] For example: (1) Numerous newspapers in which the relevant articles were not specifically designated; and (2) the tape recording of which no transcription had been made.

The admissibility of such evidence, although a novel question to this court, has been before other courts and, in general, such evidence has been received. *Curcio* v. *United States,* 354 U. S. 118, 121, n. 2. *Emspak* v. *United States,* 349 U. S. 190, 200. *Hoffman* v. *United States,* 341 U. S. 479, 489. *Marcello* v. *United States,* 196 F. 2d 437, 440–441 (5th Cir.). *In re Portell,* 245 F. 2d 183, 185 (7th Cir.). *Poretto* v. *United States,* 196 F. 2d 392, 395 (5th Cir.). *United States* v. *Girgenti,* 197 F. 2d 218, 220 (3d Cir.). *United States* v. *Weisman,* 111 F. 2d 260, 262 (2d Cir.). See *Maffie* v. *United States,* 209 F. 2d 225, 227 (1st Cir.).

It is true that the petitioner's counsel was allowed to refer to the excluded evidence in argument and thus to bring the substance of much of this evidence to the judge's attention. And it is also true that the judge said that he would consider the petitioner's probation record even though it was excluded as evidence. But neither of these concessions cured the blanket exclusions. The effect of the ruling excluding the evidence was an indication that the judge considered this evidence incompetent. Whether and to what extent any of it was actually considered is pure speculation.

Thus far we have discussed the admissibility of the excluded evidence in general terms. The trial judge should have considerable discretion as to the sort of evidence that he admits in a case like this, and no attempt will be made here to place limits on this discretion. But inasmuch as the case must be reheard a few words for the guidance of the trial judge may not be amiss.

(a) The transcript of the proceedings before the first judge had nothing to do with the "reasonable possibility" of incrimination and would have added nothing to the petitioner's case.

(b) The examination of the district attorney concerning his radio broadcast was designed to elicit information about the circumstances of the investigation and plans of the district attorney's office. No offer of proof was allowed, but

the questions themselves indicate the petitioner's purpose.[1]
In view of the difficulties of proof with which the petitioner
was faced, it is hard to say that this line of inquiry was
irrelevant.  *Alexander* v. *United States,* 181 F. 2d 480, 484
(9th Cir.).  *Healey* v. *United States,* 186 F. 2d 164, 166–167
(9th Cir.).  See *Hoffman* v. *United States,* 341 U. S. 479,
487–488; *United States* v. *Jaffe,* 98 F. Supp. 191, 194-195
(D. D. C.).  We are not to be understood as holding that
enforcement officials may ordinarily be examined by the de-
fendant in a contempt case in order to determine the pro-
priety of a claim of privilege.  But if enforcement officials
publish or broadcast material involving persons who might
be prospective defendants in a criminal case — a practice
which was disapproved by this court in *Commonwealth* v.
*Geagan,* 339 Mass. 487, 501 — the Commonwealth cannot
complain if the published material is the subject of inquiry
in a case like the present.  See *Delaney* v. *United States,*
199 F. 2d 107 (1st Cir.).

(c) The examination of the assistant district attorney
was designed to bring out his past statements in regard to
the ownership of the Coliseum Restaurant and the move-
ments of Carolyn Diabo and "Mickey" Taylor on the night
of November 11 or the morning of November 12, 1959.  The
question of ownership is relevant, in view of G. L. c. 138,
§§ 23 (last paragraph), and 62.  The questions whether the
petitioner knew the young women may not be criminatory
under our "reasonable possibility" rule, but this would be
best decided by the judge upon examination of all the evi-
dence.

(d) The newspapers offered by the petitioner contained
news articles about the murder, the district attorney's

---

[1] One example will show the tenor of the purported statements made by the
district attorney in the radio broadcast.  "You must remember that these fel-
lows and many of them that we are bringing in as witnesses have been known
as hired killers.  They would have no hesitation to take the life of anybody,
and obviously people who are with them must have some fear of them, and
there must be something in their background that would connect them to make
them so closely associated together, so that we cannot predict as much success
investigating the death of a hoodlum who was found murdered with no wit-
nesses to see his body being carried to the dump in which he was found . . . .
[T]he group we're interrogating have a set purpose for retarding the investi-
gation . . . ."

plans, and the grand jury investigation. For example, in one article it was said: "Investigators for Dist.-Atty. John J. Droney said Sandrelli saw DeMarco in his restaurant a few hours before the gangster's bullet-pocked body was found in an Everett dump November 12, and that he was able to name the men with whom the gangland victim spent his last hours. . . . 'He is in a position to give us the names of everyone who was in the restaurant with DeMarco, who left with him and other vital leads,' said one detective."[1]

Three of the questions which the petitioner refused to answer were concerned with whether he was acquainted with "Mickey" Taylor, Carolyn Diabo, and Peter Jordan, three important witnesses at the grand jury hearings, according to the newspapers. Two questions dealt with what the petitioner knew or could have known about the movements of DeMarco a few hours prior to the time he was murdered. One question indirectly called for an admission that the petitioner owned the Coliseum Restaurant. The articles in the Boston newspapers that have been presented here give some indication of the importance of these questions to the prosecution and the "reasonable possibility" of incrimination from the petitioner's answers. The judge, of course, would not have to consider an undigested mass of newspapers containing a few relevant articles, but there will be opportunity at the next hearing for the petitioner to put the articles in manageable form.

The Commonwealth contends, however, that newspaper articles are not competent evidence because, as they were hearsay, they could be introduced only to show the reasonableness of the petitioner's apprehension, an issue not pertinent in these proceedings. See *Alexander* v. *United States,* 181 F. 2d 480, 484 (9th Cir.); *United States* v. *Jaffe,* 98 F. Supp. 191, 194-195 (D. D. C.). In the usual case this argument would prevail. But in cases of this sort newspaper articles have been considered in determining the rea-

---

[1] Boston Herald, November 26, 1959.

sonableness of the claim of privilege. *United States* v. *Weisman*, 111 F. 2d 260, 262 (2d Cir.). See *Hoffman* v. *United States*, 341 U. S. 479, 488–489. See also cases cited at page 137. It must be conceded, however, that, where such evidence has been considered, there has been little or no discussion of the hearsay aspects of the evidence.[1] The difficulties of proof for a witness where the privilege against self incrimination is involved and the limited use for which the evidence is required make it desirable to put aside the hearsay rule in regard to newspaper articles in these cases. See Falknor, Self-Crimination Privilege: "Links in the Chain," 5 Vand. L. Rev. 479, 505 (1952). The articles, although technically hearsay, were admissible, we think, to furnish a background to enable the judge to determine the reasonableness of the claim of privilege. Since this evidence was offered by the petitioner there was no violation of the right of confrontation. See art. 12 of our Declaration of Rights.

(e) The petitioner offered the tape recording of the district attorney's radio broadcast, presumably to show statements of the district attorney which were not allowed to be brought out on direct examination. If presented at the new hearing in the form of the typewritten transcript presented here, it would be admissible, subject to the judge's discretion to exclude repetitious evidence.[2]

(f) The examination of the secretary of the Boston licensing board was designed to elicit information about the ownership of the Coliseum Restaurant, and complaints and investigations relative thereto. The relevance of this information has already been discussed under (c).

(g) The petitioner's probation record was excluded, al-

---

[1] McCormick on Evidence, § 129, n. 10, says: "The courts have not made clear how these [newspaper articles] are competent. If offered to show the prosecutor's intentions they are hearsay, but perhaps the court may be justified in dispensing with the hearsay rule in passing on this preliminary question of fact . . . . If offered to show the witness' apprehension they would not be hearsay . . . but it is not easy to see their relevance. The state of fear of the witness seems irrelevant. It is the judge's appraisal of the danger that is significant."

[2] The discussion of the hearsay objection in paragraph "d" is applicable here.

though the judge presumably considered it relevant since he said that he was "taking notice" of its contents in deciding the case. It may be, as the Commonwealth has argued, that this evidence was not admissible in the form in which it was offered but it seems more likely that the exclusion was part of the flat refusal to consider the circumstances under which the privilege was invoked. This evidence if presented in proper form at the retrial of the case should be received.

3. The Commonwealth contends that the transcript and the exhibits admitted de bene by the single justice are not part of the record on a writ of error (see *Blankenburg* v. *Commonwealth,* 260 Mass. 369, 377) and may not be considered in determining whether the judge properly held the petitioner in contempt. This contention cannot prevail. The review on a writ of error, provided by G. L. c. 250, §§ 1, 2, 9–13, is "[s]peaking broadly . . . 'of matters of law apparent on the record of the court in which the judgment was entered as disclosed by the return.'" *Guerin* v. *Commonwealth,* 337 Mass. 264, 268. "'The error of fact in a judgment which may be reviewed upon writ of error . . . does not refer to errors as to findings of fact made at a trial,'" but rather to "'issues of fact [which] are not concluded by the trial where there was no legally sufficient opportunity to litigate them at the trial.'" *Guerin* v. *Commonwealth, supra,* at pages 268–269. It was observed in the *Guerin* case that errors such as the minority, insanity, or death of the defendant; the lack of authority of a purported agent to accept service; the wrongful deprivation of counsel; and the denial of the opportunity to prepare a defence, have all been considered on a writ of error. See 337 Mass. at page 268, and cases cited. Compare *Aronson* v. *Commonwealth,* 331 Mass. 599, 602–603; *Couture* v. *Commonwealth,* 338 Mass. 31, 33. Although the scope of review on a writ of error in a criminal contempt case is not to be expanded merely because the writ of error is the only available mode of review (*Dolan* v. *Commonwealth,* 304 Mass. 325, 334–336), the special nature of these proceedings, often result-

ing in jail sentences without the safeguard of a jury trial, requires that the fundamentals of a fair hearing be clearly satisfied.[1]

This is illustrated by *Garabedian* v. *Commonwealth,* 336 Mass. 119. There a lawyer who had an earlier connection with a case then before the court was called upon to testify before a probate judge one day when he was in the court on unrelated business. The judge was not satisfied with the lawyer's answers and summarily sentenced him to jail for contempt of court. This court held that, since this was not a case where the judge could decide whether the witness was telling the truth merely from hearing him testify, "due process called for an opportunity to secure counsel and to prepare and present a defence." 336 Mass. at page 125. It was recognized that the finding that the petitioner was guilty of contempt "is not conclusive upon him or his rights" and that "allegations of the evidence made in the petition . . . [being] essential to a setting forth of the circumstances in which the adjudication of contempt was made . . . are in no true sense a contradiction of the record." 336 Mass. at page 126.

Whether the court has given proper consideration to the claim of a privilege when questions are innocent on their face similarly requires a consideration of the circumstances of the case. If the petitioner was not allowed to introduce evidence bearing on the criminatory nature of the questions, he was deprived of an opportunity to prove threatened denial of a constitutional right. That can only be determined by examining it here. This goes beyond what was held in the *Garabedian* case since the concern here extends to more than the procedural due process or lack of it of the original hearing. The principle, however, is the same. Thus the issue is not the merits of the contempt judgment, but rather whether the petitioner was given such opportunity as would

---

[1] In *Jones* v. *Commonwealth,* 327 Mass. 491, matters ordinarily outside the scope of a proper record were included in the record and were considered. Since, however, the propriety of considering such evidence was not raised, that case cannot be treated as an authority on the point.

satisfy constitutional requirements to present proof which had an important bearing on whether he was properly adjudged in contempt.

This decision is in harmony with prior holdings to the effect that on a writ of error the petitioner is not bound by those facts which he did not have an opportunity to litigate adequately at the trial. *Brown* v. *Commonwealth,* 335 Mass. 476, 479–480. *Garabedian* v. *Commonwealth,* 336 Mass. 119, 125–126. *Guerin* v. *Commonwealth,* 337 Mass. 264, 268–269. And it does not overrule the long line of decisions that there can be no further consideration of evidence heard at the trial; rather it sets forth a qualification not heretofore considered. See *Hurley* v. *Commonwealth,* 188 Mass. 443; *Blankenburg* v. *Commonwealth,* 260 Mass. 369, 376–377; *Dolan* v. *Commonwealth,* 304 Mass. 325, 334–335; *Berlandi* v. *Commonwealth,* 314 Mass. 424, 442–443. We are not to be understood as holding that this court will rehear the merits of criminal contempt cases generally. The peculiar problems of relevance where the constitutional privilege against self incrimination is involved present an unusual situation.

Little need be said about the particular transcript and the exhibits considered here. The general principle is that enough evidence will be considered to permit a reasonable examination of the petitioner's claim. The sort of evidence which is to be considered by the single justice and by this court will necessarily vary from case to case. The relevance of substantially all of this evidence has already been discussed.

> *Judgment reversed.*
> *Case remanded to the Superior Court*
> *for further proceedings.*