COMMONWEALTH *vs.* MICHAEL J. FAVULLI & another.

Suffolk.     October 3, 1966. — March 1, 1967.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK,
SPIEGEL, & REARDON, JJ.

*Grand Jury. Constitutional Law,* Separation of powers, Grand jury,
  Equal protection of laws. *Attorney General. Massachusetts Crime
  Commission. Special Commission. Practice, Criminal,* Plea in abate-
  ment, Appeal with assignments of error, Remark by judge. *Conspiracy.
  Bribery. Evidence,* Of conspiracy, Presumptions and burden of proof.

G. L. c. 278, § 27, as appearing in St. 1962, c. 480, does not bar a de-
  fendant in a criminal case made subject to §§ 33A–33G from appealing
  to this court from a decision of the Superior Court upon a plea in abate-
  ment involving constitutional issues.   [97–99]
The circumstances, that counsel for the Massachusetts Crime Commission,
  created by Res. 1962, c. 146, as an agent of the General Court to in-
  vestigate organized crime and corrupt practices in government, were
  appointed unpaid special assistants to the Attorney General and pre-
  sented or assisted him in presenting to grand juries evidence of matters
  which as counsel for the commission they had investigated for it and
  which it had referred to the Attorney General for his uncontrolled dis-
  position, did not constitute a violation of art. 30 of the Declaration of
  Rights of the Massachusetts Constitution.   [99–104]
With respect to indictments for soliciting bribes and conspiracy to solicit
  bribes returned by a grand jury upon inquiry into matters involving a
  number of transactions and persons, including the Governor and Coun-
  cil, there was no violation of art. 12 of the Declaration of Rights of the
  Massachusetts Constitution by reason of the presence in the grand jury
  room at the same time on several days during the jury's deliberations
  of assistants to the Attorney General not exceeding three in number,
  except on the day the indictments were returned and an earlier day,
  when five assistants were present with the Attorney General at a table
  reserved for counsel, where it appeared that the assistants had been con-
  nected with the investigation and production of the evidence associated
  with the indictments, that the grand jury were instructed that the prose-
  cutors were available to give counsel but were in the room only at the
  jury's sufferance, and that twice all the prosecutors left the room at the
  jury's request on the day the indictments were returned, and it did not
  appear that the presence of the assistants was for any other purpose
  than the effective presentation of the evidence.   [104–107] SPIEGEL, J.,
  with whom KIRK, J., joined, dissenting.
The fact that indictments were returned by a special grand jury convened
  under G. L. c. 277, § 2A, and serving at the same time in the same court
  as a regular grand jury, did not deny the defendants equal protection

of the law even if the special grand jury heard only cases resulting from investigations by the Massachusetts Crime Commission and heard them upon presentations of evidence by its counsel following their appointments as special assistants to the Attorney General.    [107–108]

A contention that an indictment charging that four members of the Executive Council conspired with each other and with two named persons to request and accept bribes for their votes to confirm a nomination was invalid because the two named persons were alleged to be the givers of the bribes and were joined as conspirators was without merit.    [108–109]

Evidence warranted conviction of two defendants, members of the Executive Council, upon an indictment with a bill of particulars charging a conspiracy of the defendants and two other named Councillors and others to request and accept gifts and gratuities for the defendants' and the other named Councillors' votes to confirm a nomination, and upon indictments charging the two defendants with soliciting bribes.    [113–115]

At the trial together of indictments against several defendants, it was not necessary for the judge to instruct the jury in terms that finding one defendant guilty did not necessarily require the jury to find another defendant or all defendants guilty, or, in his charge, to repeat for each defendant appropriate general instructions given as to the necessity of proof of guilt beyond a reasonable doubt.    [115–116]

There was no prejudicial error as to any defendant at a criminal trial against several defendants in a remark of the judge in the course of his charge that "if the defendants can't control their emotions, I will have to ask them to leave the court room," where it appeared that the remark referred to the conduct of one defendant over a considerable period in shaking his head back and forth.    [116]

THREE INDICTMENTS found and returned on October 13, 1964.

Motions to quash the indictments and pleas in abatement were heard in the Superior Court by *Hudson,* J., and the cases were tried before him.

*Alvan Brody & Robert G. Clark, Jr. (Charles J. Dunn* with them) for the defendant Favulli.

*Stephen A. Moynahan (Alexander E. Finger* with him) for the defendant Sullivan.

*Sumner H. Babcock,* Special Assistant Attorney General (*John J. Madden & Harold M. Willcox,* Special Assistant Attorney General, with him), for the Commonwealth.

WHITTEMORE, J.    These are appeals by two defendants convicted of soliciting a bribe and conspiracy to solicit a bribe.    The proceedings and the trial were subject to G. L. c. 278, §§ 33A–33G.

Commonwealth *v.* Favulli.

The conspiracy indictment charged that the defendants Favulli and Sullivan, with Joseph R. Crimmins and Ernest C. Stasiun, all then being members of the Executive Council of the Commonwealth, and Foster Furcolo, then the Governor, conspired with each other and with Leo F. Benoit (not a defendant) and others not named to request and accept from Mr. Furcolo, Benoit, and others money for their votes to confirm the nomination of Anthony N. DiNatale as Commissioner of the Department of Public Works. At the close of the evidence the judge directed a verdict of not guilty as to Mr. Furcolo. There were verdicts of guilty against the other four defendants. Stasiun and Crimmins, after claiming appeals, withdrew them and began the service of their sentences. See *Massachusetts Bar Assn.* v. *Cronin,* 351 Mass. 321, 324–325.

Separate indictments charged in one count that the Councillor named therein had solicited a gift or gratuity for his vote for the confirmation of DiNatale and in a second count that he had accepted the gift or gratuity. Verdicts were directed under the second counts.

THE PLEAS IN ABATEMENT.

The ground stated in the pleas of the defendants was "That during the proceedings before the Grand Jury, which resulted in this indictment, there was present at all times . . . counsel for the Crime Commission, who had been engaged in the preparation of the case against the Defendant; that . . . [such] presence . . . even under the guise as a so-called Special Assistant Attorney General, was in violation of the Defendant's rights under Article 12 of the Declaration of Rights."

The pleas were dealt with as raising also an issue under art. 30 of the Declaration of Rights.

(1) *The right of review on appeal.*

General Laws c. 278, § 27,[1] as appearing in St. 1962, c. 480,

---

[1] "The decision of the superior court on questions raised upon a plea in abatement to an indictment or complaint shall be final, except that the commonwealth may appeal to the supreme judicial court from any such decision founded upon a matter of law apparent upon the record."

in terms makes "final" as to defendants the decision of the Superior Court on pleas in abatement. Section 33B provides: "A defendant in a case . . . made subject to . . . [§§ 33A–33G] aggrieved by an opinion, ruling, direction or judgment . . . , rendered upon any question of law arising out of such case . . . but not upon a plea in abatement, who desires to appeal therefrom . . . shall . . . file a claim of appeal . . . ." The General Court in giving a right of appeal to the Commonwealth from the decision upon a plea in abatement rejected a proposal to express a right of appeal in the defendant. 1962 House Bill Nos. 1552, 3707. 1962 Senate Bill No. 691. St. 1962, c. 480.

In *Commonwealth* v. *Hanley,* 337 Mass. 384, 386, cert. den. sub nom. *Hanley* v. *Massachusetts,* 358 U. S. 850, we said, as to an appeal under c. 278, §§ 33A–33G, "We do not think that . . . c. 278, § 27 . . . can operate to deprive the defendant of a review of a decision so far as it involves a constitutional right." The Commonwealth in oral argument referred to a conflict between the *Hanley* case and *Commonwealth* v. *Kozlowsky,* 238 Mass. 379, 391, where, after reviewing and declaring constitutional the overruling of a plea, this court held that, in any event, § 27 was a conclusive answer to the attempt to present the issue on exceptions.

Without consideration of the statutory provisions, this court in a number of other cases arising on exceptions or appeal has reviewed constitutional issues raised by decisions on pleas in abatement. *Commonwealth* v. *Clune,* 162 Mass. 206. *Commonwealth* v. *Harris,* 231 Mass. 584, 586–587. *Commonwealth* v. *Geagan,* 339 Mass. 487, 495–498 (cert. den. sub nom. *Geagan* v. *Massachusetts,* 361 U. S. 895). *Commonwealth* v. *Monahan,* 349 Mass. 139, 157–158. *Commonwealth* v. *Slaney,* 350 Mass. 400, 401–402. In *Commonwealth* v. *Woodward,* 157 Mass. 516, the overruling of the plea was sustained on evidentiary, not constitutional, grounds.

The implication of an exception of constitutional issues from the statutory bar of review in due course of decisions on pleas stems from the constitutional rights of every per-

son within the jurisdiction to be tried in accordance with the law of the land and assured the equal protection of the laws. It will not do to have an important constitutional issue resolved by this court upon report in one case (as will result if, in his discretion, a judge in the Superior Court acts under c. 278, § 30A), and yet stand decided to the contrary for purposes of another case on the unreported decision of the judge there ruling. Equally unreasonable would be two opposing unreported Superior Court rulings on the same constitutional issue in different cases.

Nor do we think that, as to a case in which G. L. c. 278, §§ 33A–33G, have been made applicable, the defendant should be restricted to writ of error for an adjudication of the constitutional issues. For the availability of the writ, see, by analogy, the cases cited in *MacKenzie* v. *School Comm. of Ipswich,* 342 Mass. 612, 614. The issues would not stand differently if so presented. Section 33A requires that the evidence be taken and certified in "any proceeding or trial" made subject to §§ 33A–33G. This evidence so far as necessary to determine the constitutional issues would be available on writ of error. *Brown* v. *Commonwealth,* 335 Mass. 476, 479–480. *Sandrelli* v. *Commonwealth,* 342 Mass. 129, 141–143. See *Shoppers' World, Inc.* v. *Assessors of Framingham,* 348 Mass. 366, 376, fn. 9. It is highly inadvisable that the resolution of threshold constitutional issues, which upon a report could have been decided before trial, be postponed any longer than our present statutes and procedures inescapably require, or that there be separate appellate procedures where no substantive purpose is served. Indeed the statutory scheme that brought in §§ 33A–33G also showed an intention that, so far as might be, reviewable issues of law should be reviewed on appeal rather than on writ of error. *Guilmette* v. *Commonwealth,* 344 Mass. 527, 529.

(2) *The alleged violation of art. 30 of the Declaration of Rights following the appointment of persons who were attorneys for the commission as assistants to the Attorney General.*

Resolves 1962, c. 146, creating the so called "Massachusetts Crime Commission" provided in part: "Upon order of the commission its counsel shall present to a grand jury for its action, or submit to the attorney general, a district attorney or other law enforcement agency, such evidence which has come to the attention of the commission as in the opinion of the commission warrants such presentation or submission."

The judge, as the evidence warranted, found that the commission had proceeded by referral to the Attorney General and that none of its attorneys were authorized by the commission to present matters directly to the grand jury. The Attorney General had complete control of the presentation of grand jury evidence submitted by the commission. Facts peripherally related to the indictments, having been referred to the Attorney General, "were developed by him from facts already in his possession, that resulted in the matter being presented to the Grand Jury."

Attorneys who were or had been paid counsel for the commission participated in the presentation of the evidence to the grand jury. In this work each was acting as a duly appointed special assistant to the Attorney General without compensation. One attorney was active as such special assistant in the presentation of cases to the grand jury over an extended period during which he was on the staff of the commission. He did not charge the commission for time spent in the grand jury room but did charge it for time devoted on the same days to preparing evidence for presentation to the grand jury. These special assistants presented or assisted in presenting evidence as to matters which they had investigated for or presented to the commission.

There is no doubt that the commission was an agent of the General Court performing an appropriate investigatory function. *Commonwealth* v. *Benoit,* 347 Mass. 1, 6. *Sheridan* v. *Gardner,* 347 Mass. 8, 16–18. *Gardner* v. *Massachusetts Turnpike Authy.* 347 Mass. 552, 558–559. We have already ruled that art. 30 was not violated by the provisions

of the resolve for the use by law enforcement agencies of evidence uncovered by the legislative commission. *Sheridan* v. *Gardner, supra,* 17–18. The issue adverted to in *Gardner* v. *Massachusetts Turnpike Authy., supra,* 558–559, but now for the first time presented for decision, is whether the legislative department was participating in presenting the evidence to the grand jury in violation of art. 30.

In *Cosmopolitan Trust Co.* v. *Mitchell,* 242 Mass. 95, 116, this court stated the controlling principle by quoting from *Kilbourn* v. *Thompson,* 103 U. S. 168, 191: "It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall . . . be limited to the exercise of the powers appropriate to its own department and no other."

There is nothing inherently repugnant to the concept of separation of powers that agents of one branch also act as agents of the other. Of course these agents of an instrumentality of the General Court were not legislators. The task of the attorneys for the commission was to ferret out and present to the commission the facts as to suspicious conduct suggestive of corruption in government. Although serving a legislative purpose, this work was not in its own nature legislative. "The ascertainment of facts in its essence is not a legislative function." *Attorney Gen.* v. *Brissenden,* 271 Mass. 172, 180. Such work by these agents of the commission was generically like that of agents of the executive department in discovering crime and presenting the facts to a grand jury.

Only duly appointed subordinates of the Attorney General or that official himself dealt with the grand jury. These subordinates had no obligation to the commission or to its principal the General Court in any degree inconsistent with their duties as special assistants to the Attorney General. The defendants refer to the assertion of the commission in its Third Annual Report, December 2, 1963, p. 2: "Its recommendations for remedial legislation will not

carry weight unless the existence and nature of corruption can be shown by naming the persons who have been guilty of corrupt practices and by describing the patterns of their corruption. This cannot be done until their guilt has been proven by their conviction.'' In thus showing that a specific legislative purpose would be served by action which was in any event required in the public interest, the commission did not disqualify persons who acted as its attorneys from action in the executive department.

We reject the suggestion that the commission or its agents, because of their legislative authority and obligation or for any other reason, would wish to have indictments if the facts fairly presented to a grand jury did not so warrant. Neither the commission nor its agents had any personal concern, as might be the case of a citizen who had been wronged by what he believed to be criminal conduct. Compare *Commonwealth* v. *Gibbs,* 4 Gray, 146. The members of the commission were unpaid, and might neither hold public office, except that of justice of the peace or notary public, nor be members of any political committee. Not more than four of its seven members could be members of the same political party. The independence and impartiality of the commission were reasonably assured. The agents referred to were members of the bar. Their commitment to securing an indictment of persons who, as their investigation appeared to indicate, were guilty of crime was not different from the commitment of the usual public prosecutor to the same end. The defendants themselves cite *Smith* v. *Commonwealth,* 331 Mass. 585, 591, ''It is well understood that the duty of a district attorney is not merely to secure convictions.'' And see American Bar Association, Canons of Professional Ethics, No. 5: ''The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done.''

The commission, of course, did not directly exercise the power set forth in the resolve to ''present'' matters to the grand jury. See the *Sheridan* case, *supra,* 347 Mass. at 15–16. Nor did it do so indirectly. On the facts found, the

Attorney General's action was the product of his own decision, in no way dictated or controlled by any members of the commission or of its staff. All exercise of power by the commission ended when the matter referred reached the Attorney General. *Opinion of the Justices,* 208 Mass. 610, 613. There was no merger of functions in the persons of his assistants.

What this court has held and its Justices have said support our construction. In *Attorney Gen.* v. *Brissenden,* 271 Mass. 172, 180, 183, the court upheld the appointment of the Attorney General as a special investigating committee for the General Court. Accord, *Nelson* v. *Wyman, Atty. Gen.* 99 N. H. 33. See also *Opinion of the Justices,* 328 Mass. 655, 661.

In *Opinion of the Justices,* 307 Mass. 613, 618, the Justices were of the opinion that membership on a local Federal draft board and the holding of the office of judge of the Superior Court would not be constitutionally incompatible. They said: "Moreover, though a judge of the Superior Court is a part of the judicial department of the government of this Commonwealth, the powers that would be conferred upon him by his appointment as a member of a local board or of an appeal board would be conferred upon him as an individual, and not as a part of the judicial department of the Commonwealth."

An illustration of what would be a violation of art. 30 is presented in *Ames* v. *Attorney Gen.* 332 Mass. 246, 253, where this court held that it would constitute intolerable interference by the judiciary with the executive department for the court to require that the Attorney General permit the use of his name in a suit to determine whether proposed action by a trustee would be a breach of trust. Compare also *Denny* v. *Mattoon,* 2 Allen, 361, 376–380; *Forster* v. *Forster,* 129 Mass. 559, 561–562. See also The Federalist, No. 47, where Madison develops the thesis that the origin of the concept of separation of powers is that to avoid tyranny the whole power of one of the three departments must not be exercised by another department.

We conclude that there was no violation of art. 30 of the Declaration of Rights.

(3) *The alleged violation of art. 12 of the Declaration of Rights because of the presence in the grand jury room of several special assistants to the Attorney General.*

We have dealt above with the contention that the special assistants to the Attorney General, because they were also agents of the crime commission, were unauthorized strangers in the grand jury room. We rule that this presence did not contravene the established grand jury procedures (see *Jones* v. *Robbins,* 8 Gray, 329) which are guaranteed by art. 12. The authorities relied on by the defendants are not in point. *Commonwealth* v. *Harris,* 231 Mass. 584, *Opinion of the Justices,* 232 Mass. 601, 602, 604, and *Lebowitch, petitioner,* 235 Mass. 357, 362, dealt with the presence of persons other than duly appointed prosecutors.

The defendants lay stress, however, on the number of assistants present at the same time and particularly to six prosecutors being present on October 13, 1964, the day when the indictments were returned. As to this issue, the judge, in accordance with the evidence, found that except on two days the number of assistants or special assistants to the Attorney General present in the grand jury room did not exceed three, and that on October 7 and October 13, during the presentation of testimony, the number of assistants or special assistants present was five, and that on those days the Attorney General was also present, and that all the attorneys sat at a table reserved for counsel. In overruling the plea, he found or ruled in part as follows: "The limitations of inquiry into deliberations and hearings in the Grand Jury room necessarily require speculation as to the simplicity or complexity of the matter being presented. Therefore, there can be no yardstick to determine what is a reasonable number . . . . The efficiency of presentation of evidence may have required different assignments to different Assistants for various aspects of the hearing. The Assistants involved in the allegations of the Plea are persons who were connected with the investigation or prep-

aration and production of the evidence associated with the indictments . . . . They were not witnesses, bystanders, or spectators while in the Grand Jury room. They were authorized persons, within the meaning of the law.·. . . [T]his procedure did not destroy the force and vital principle of the oath . . . [of secrecy]."

The judge correctly applied the applicable constitutional principles. Article 12 was not violated. The defendants err in suggesting that our cases either limit to a specific number the prosecutors who may be present or require that the number be determined only by the imperative necessities of the presentation. In *Opinion of the Justices,* 232 Mass. 601, 603, it was said, "It has been the practice for more than two hundred years for . . . [the grand jury proceedings] to be in private, except that the district attorney and his assistant are present." In *Commonwealth* v. *Kozlowsky,* 238 Mass. 379, 390, the court said: "The power of the Attorney General . . . enabled him personally or by his assistant to be present . . .." There is in these words no implication that the presence of more than one assistant would be contrary to the law of the land. The practice, noted by the court, that two prosecutors customarily be present, appears founded in the convenience of the presentation rather than any inherent necessity. In *Lebowitch, petitioner,* 235 Mass. 357, 361–362, the court noted that the rule of the *Harris* case, 231 Mass. 584 (the presence of two policemen and other persons was unconstitutional), was founded in the requirement of secrecy. The court, after giving certain illustrations of exceptions to the rule that no "more than one person" may be present, concluded that it "is only when some imperative compulsion requires . . . *that more than one stranger at a time* may be before the grand jury" (emphasis supplied). In *Opinion of the Justices,* 232 Mass. 601, 604 (with reference to the *Harris* case, *supra,*) it was not numbers that the court referred to but rather "the attendance of a police officer [that] would afford opportunity for subjecting witnesses to fear or intimidation."

Commonwealth *v.* Favulli.

There are, we think, two controlling principles: (1) The prosecutor has discretion as to the use of assistants and (subject to the principle next stated) may have present from time to time such reasonable number as he deems appropriate. (2) In presenting cases to the grand jury the prosecutor and his assistants must scrupulously refrain from words or conduct that will invade the province of the grand jury or tend to induce action other than that which the jurors in their uninfluenced judgment deem warranted on the evidence fairly presented before them.

This court will assume, as did the judge below, that, unless the facts require another conclusion, the prosecutor did not have assistants present for any other purpose than the effective presentation of the evidence. This assumption being applicable, the burden is not on the Commonwealth to show a necessity, or indeed the reason, for the presence of the prosecutors as distinguished from strangers.

We reject the contention that the presence of six prosecutors on two occasions in itself shows an overstepping of the prosecutor's function and an invasion of that of the grand jury. It was not beyond reason in the circumstances. The indictments showed that six named persons "with others" were involved. We now know that the matter being presented did involve a number of persons and transactions. See (6) below.

No adequate basis exists for assuming that it might have appeared to the grand jury that assistants were present other than in due course for the efficient presentation of the matter at hand. We believe that grand jurors assume, as they should, that the prosecutor would not be presenting the evidence if he were not convinced that it warranted their consideration. The presence of a number of assistant prosecutors does not reinforce the implied representation. The presence of a number of prosecutors, even though apparently justified by the ramifications of the facts, may also suggest that the matter is deemed highly important. But the importance of a matter involving the Governor and the Executive Council was self-evident. The presence of a

number of assistant prosecutors could add no significant emphasis, whether on the day of the return of the indictments or at an earlier time. The presence of a particular person who has previously interviewed a witness being interrogated may tend to hold the witness to his previous testimony. That is always the possibility if the prosecutor present is the one who has interviewed the witness in the course of the investigation. There is no intimidation involved in this.

Nothing in this record suggests that this grand jury were overawed or moved to act other than as the members deemed right. It appears that the grand jury understood and exercised its independence and its prerogative. There is evidence that they were instructed both by a judge of the Superior Court and the chief prosecutor that the prosecutors were available to give counsel but were in the room only at the grand jury's sufferance. There is also evidence that on October 13, 1964, the prosecutors were requested to leave the room and they all did so for two separate periods of time. This warrants the inference that the grand jurors, at least as to some matter or matters, made decisions in the absence of the prosecutors before returning the indictments.

We believe that prosecutors fully understand the advisability of refraining from the use of an unusual number of assistants. Apart from unnecessarily raising an issue under art. 12, an obvious risk would be the irritation of the grand jury against the prosecutors with adverse effect upon the case presented.

(4) *The contention that the defendants were denied equal protection in that the indictments were returned by a special grand jury.*

It does not adequately appear that this issue was presented below or duly reserved by assignment. See *Newton v. Commonwealth,* 333 Mass. 523, 524. Averments that the grand jury was convened and subsequently extended in violation of law reasonably relate to noncompliance with applicable statutes, rather than to constitutional defects. Notwithstanding this, we consider the points raised. The spe-

cial grand jury was convened under G. L. c. 277, § 2A.[2] So convened, it was a grand jury drawn, summoned, and returned as is a regular grand jury and with the same powers. The record does not show that as the defendants contend and as seems likely, the grand jury heard only commission cases. We rule in any event, however, that there would be in this no basis for a claim of unreasonable classification. Whether a regular or a special grand jury happens to hear a variety of matters from a variety of complainants, or a variety of matters, or one matter, from one complainant is inconsequential. The statutory procedures that assure the constitutional rights of the defendants are the same. We need not consider what would be the status of a "blue ribbon jury" if such a jury were brought into existence for a special class of offences or a special class of accused. See *Fay* v. *New York*, 332 U. S. 261, 268.

We see nothing unconstitutional in having two grand juries at work in the same court at the same time. We do not overlook holdings or suggestions to the contrary in a few other jurisdictions.

The procedures for presentation of the evidence, through the appointment of special assistants who also worked for the commission, did not make this a constitutionally different kind of grand jury.

## The Motions to Quash.

(5) *The conspiracy indictment as an offence cognizable under our law.*

Motions to quash raised, in substance, the issue whether there was violation of the rule that an agreement by two

---

[2] "The clerk of the courts in any county, or in Suffolk the clerk of the superior court for criminal business, shall, upon written request of the attorney general accompanied by a certificate that public necessity requires such action, signed by the chief justice of the superior court, issue writs of venire facias for twenty-three grand jurors for service as a special grand jury to hear, consider and report on such matters as the attorney general may present. Said jurors shall serve for a period of six months, unless sooner discharged by the attorney general or by the said chief justice, and shall be drawn, summoned and returned in the same manner, and shall have the same powers and receive the same compensation, as grand jurors summoned for service under sections one and two, and the provisions of sections four to fourteen, so far as apt, shall apply to such jurors."

persons to commit a particular crime cannot be prosecuted
as a conspiracy when the crime is of such a nature as neces-
sarily to require the participation of two persons for its
commission.   Anderson, Wharton's Criminal Law & Proce-
dure, § 89, p. 191.   A leading case exemplifying this rule is
*Gebardi* v. *United States,* 287 U. S. 112, 123, which holds
that a woman acquiescing in her transportation by a man
does not commit the offence of conspiracy to violate the
Mann Act.   Where the conspiracy involves elements in ad-
dition to those contained in the substantive offence the rule,
by its rationale, is inapplicable.   72 Harv. L. Rev. 920, 954.
Perkins, Criminal Law, pp. 535–536.   " [W]hen a third per-
son conspires with a man and a woman for the commission
of adultery by the latter two, all three are guilty of con-
spiracy."   Wharton, *supra,* p. 193.

The defendants suggest that, in the construction of the
indictment, they and the other Councillors are to be re-
garded as a unit, as the takers of the bribe, and the other
two persons named, or either of them, as the giver.   This
is unsound.   It is established that a conspiracy among sev-
eral to accept bribes from third persons is a criminal of-
fence and the rule is inapplicable.   *Commonwealth* v. *Man-
nos,* 311 Mass. 94, 111.   Persons conspiring as the defend-
ants were charged with doing do not lose their individual
significance for purposes of the offence because the alleged
bribe givers are joined as conspirators.   As to the bribe to
be given Crimmins, for example, the other Councillors were
third parties.   Beyond this, the danger of the concert of
plan and action was the substantive justification for a
conspiracy indictment.   See *Commonwealth* v. *Waterman,*
122 Mass. 43, 57; *Commonwealth* v. *Dyer,* 243 Mass. 472,
484.   Only a majority of Councillors could effectively pre-
vent the confirmation of DiNatale.   Undoubtedly there
exists the risk of abuse in indictments for conspiracy; this
case, we think, clearly does not show it.

Authorities elsewhere sustain our view.   *O'Leary* v.
*United States,* 53 F. 2d 956, 957–958 (7th Cir.), cert. den.
283 U. S. 830.   *Old Monastery Co.* v. *United States,* 147

Commonwealth *v.* Favulli.

F. 2d 905, 907–908 (4th Cir.), cert. den. 326 U. S. 734. *United States* v. *Smolin,* 182 F. 2d 782, 786 (2d Cir.), distinguishing *United States* v. *Zeuli,* 137 F. 2d 845 (2d Cir.). *Medrano* v. *United States,* 285 F. 2d 23, 26, fn. 3 (9th Cir.), cert. den. 366 U. S. 968. *Reno* v. *United States,* 317 F. 2d 499, 503–504 (5th Cir.), cert. den. 375 U. S. 828. *State ex rel Durner, Sheriff,* v. *Huegin,* 110 Wis. 189, 243–244. See also *Pinkerton* v. *United States,* 328 U. S. 640, 643. *United States* v. *Katz,* 271 U. S. 354, 355, indicates that an indictment for conspiracy of one buyer and one seller of whisky would be doubtful, but cites *Vannata* v. *United States,* 289 Fed. 424 (2d Cir.), where the seller was convicted, having acted in concert with several others.

We are not impressed with and doubt the present force of the contrary holding in *United States* v. *Sager,* 49 F. 2d 725 (2d Cir.). See cases cited above and in particular the later *Smolin* case in the same circuit. We note also and do not follow other cases to the contrary. *People* v. *Wettengel,* 98 Colo. 193, 198. *State* v. *Aircraft Supplies, Inc.* 45 N. J. Super. 110, 120.

The motions to quash were rightly denied.

### THE CASES ON THE MERITS.

(6) *The denial of the defendants' motions for directed verdicts, rulings on evidence, the judge's charge, and his action on requests.*

The jury could have found these facts: On February 4, 1960, Governor Furcolo submitted to the Executive Council the nomination of Anthony N. DiNatale for reappointment as Commissioner of the Department of Public Works. At meetings of the Council on February 11, 18, 25, March 3, 10, 24, 31, and April 7, 1960, the nomination was not voted upon and hence was "automatically held." On April 8, 1960, at a special meeting of the Council attended by the defendants and Councillors Crimmins, Cronin, Kahalas, Means, and Stasiun, the Council voted to confirm the appointment, Councillors Means and Crimmins voting in the negative.

In the meantime certain Councillors had discussed the appointment among themselves and with the Governor's chief secretary, Daniel J. O'Connell. Immediately following the meeting on February 4, Councillors Crimmins, Sullivan, Favulli, Stasiun, and Cronin[3] met in a room above the council chamber. Councillor Crimmins said, "Here's Tony's reappointment coming up. This is a campaign year. We are all going to seek reelection or election to some other office. It's pretty well known that he has been a good fund raiser, and maybe we could talk to him about raising some funds for us." The others present "all said that DiNatale could help us with campaign funds and that Mr. Crimmins would pass on our thoughts to Mr. DiNatale."[4]

On February 18, Councillors Crimmins, Cronin, Favulli, Kahalas, Stasiun, and Sullivan conferred in respect of the DiNatale nomination with Mr. O'Connell in his State House office. All who were present spoke. The Councillors stated that they had been ignored or discriminated against in matters of patronage, the Commissioner had not been available to see Councillors to discuss their problems, and "they had been overlooked in the financial fund raising at reelection time." As to fund raising, the group discussed what amount they thought would be fair, and the Councillors "felt as though no campaign with the areas that they had to cover could be genuinely and thoroughly covered with the expense of modern-day campaigning for less than $5000." Mr. O'Connell replied, "You must be out of your mind to think in terms of campaign contributions along these lines." In the meantime Mr. O'Connell had said he would "indicate to Mr. DiNatale that they speak

---

[3] The testimony left it uncertain whether Councillor Kahalas, now deceased, was present.

[4] This testimony came from Cronin who testified also that he could remember only the substance of the conversation; he knew "we all said it," he could not remember anything in particular that Favulli or Sullivan said, that the door of the room was closed, the group was in the room fifteen to twenty minutes, nothing took place except the discussion of the nomination; the group was more or less centered about the table; Cronin heard everything that everyone was saying; he could not tell whether Sullivan was within hearing distance of Crimmins when Crimmins made the statement. Cronin also testified on cross-examination that no one spoke except Crimmins.

with him'' and they indicated their desire that that be done.

Thereafter Mr. O'Connell spoke with the Governor from time to time and reported the attitude of the Councillors. He also spoke with DiNatale who refused to meet with the Council. On one occasion the Governor said that a number of persons including Leo Benoit, Chairman of the State Housing Board, had offered to be helpful.

On April 7, Mr. O'Connell spoke with Benoit and thereafter with Crimmins telling him that he had spoken with someone who ''I think . . . can help in the campaign in the amount of $15,000.'' Crimmins replied: ''I don't want any promises. You know what the fellows have spoken about insofar as DiNatale is concerned.''

The conversation with Crimmins was about the middle of that day. The Executive Council met at 12:45 P.M. on April 7. Eight appointments were confirmed. The DiNatale appointment was again automatically held. The Lieutenant Governor, presiding, announced that when the Council adjourned it would not meet again until April 21. After establishing an interim procedure for handling warrants the meeting adjourned at 1:10 P.M.

On April 7, 1960, Nicholas J. Civitarese, a general contractor, spoke with Benoit by telephone about midday and thereafter met with him twice. At the second meeting, at about 3 P.M., Civitarese delivered to Benoit a paper bag containing $15,000 in bills. Benoit executed a note to Civitarese for $15,000.

Late in the afternoon of April 7, Crimmins said to Mr. O'Connell, ''I think we may be all right in this tomorrow.'' Sometime after adjournment of the April 7 meeting a special meeting of the Council was called for April 8. Just prior to the meeting Crimmins said to Cronin, ''It's all right to vote for Tony today.'' He also said, ''I'm going to be off'' meaning that he was going to vote against confirmation.

Immediately after the meeting Crimmins said to Cronin, ''Come on.'' They entered an automobile under the arch at the State House, and Crimmins handed Cronin an en-

velope saying, "Here." In the envelope was $2,500 in cash.

There was evidence that the Governor never authorized Mr. O'Connell to do anything in behalf of any member of the Executive Council in connection with the nomination. Sullivan and Favulli both testified. There was evidence, including their testimony, that would have warranted a finding that they did not join any conspiracy or solicit a bribe. Sullivan testified that no such conversation as Cronin testified to occurred on February 4; he was not interested in campaign funds. Favulli testified that he at all times favored confirmation and that he so told Mr. O'Connell, with emphasis, on February 18. This was corroborated.

The judge instructed the jury that the evidence of the talk between Crimmins and Mr. O'Connell of the handing of $15,000 through Benoit to Crimmins and the payment of $2,500 to Cronin was to be considered on the conspiracy indictment but not on the solicitation indictment.

(a) *The conspiracy indictment. The exceptions to evidence relating thereto.*

The defendants contend that nothing in the evidence of the meeting of Councillors on February 4 tends to prove their guilt. We disagree. It is not controlling that Cronin could not remember anything in particular that Favulli or Sullivan said, and could not tell if Sullivan was within hearing distance of Crimmins when he made the remarks. The jury could conclude that at that meeting a proposal to seek a bribe was made and acquiesced in by all present regardless of whether anyone indicated his acquiescence by words or gesture. Furthermore, Sullivan's presence when, in effect, a request was made of Mr. O'Connell for $5,000 each tended to show that Sullivan was in accord with the plan. That conversation also tended to show a conspiracy by all six to solicit a bribe.

The evidence of the February 4 and February 18 conferences was not inadmissible on the ground that it did not tend to prove the conspiracy alleged. The allegations were

not limited to a conspiracy to obtain money from Mr. Furcolo and Benoit. The indictment charged a conspiracy of named persons and "others" to request and accept gifts and gratuities from two named persons "and others." The particulars relied on by Favulli are in answer to the request to specify the acts of conspirators and "of the other persons named or referred to in the indictment." The specification[5] confirms that, as alleged in the indictment, the conspiracy was to obtain money to vote and work for the confirmation of DiNatale, and that the proof might show that the money came from others than those named. The specification did not limit the conspiracy to an effort to work only through the named conspirators. The testimony of an agreement that Crimmins should talk to DiNatale "about raising some funds for us" and of an effort through Mr. O'Connell to talk to DiNatale was evidence of the conspiracy to obtain money for confirming DiNatale. It did not show that the agreed aim of the conspiracy was confined to obtaining a payment only from him.

There is nothing in Favulli's contention that the behavior of the defendants was "equally consistent with a legitimate political decision" to solicit a campaign contribution. The evidence favorable to the Commonwealth being believed, the inescapable inference was of an intention to sell favorable confirmatory votes for a sum of money. That this money might be used for campaign expenses of course did not change the essence of what was done.

The testimony tending to show that Sullivan was interested only in improving his relations with the department

---

[5] "*Particulars:* The conspirator Executive Councillors communicated among themselves and requested a quantity of cash money upon the agreement and with the understanding and for the speech, work and service respectively stated in the indictment, the request being communicated directly and indirectly to the conspirator Furcolo, who as Governor of the Commonwealth then authorized, deputized and instructed others in the Executive Branch of the government of the Commonwealth to raise such cash from persons within the conspiracy and outside the conspiracy, including persons doing business with the Commonwealth. Pending receipt of such money such Executive Councillors participated in holding up and postponing the confirmation of Anthony N. DiNatale as Commissioner of the Department of Public Works. The conspirator Benoit and others then raised cash as aforesaid and transmitted it from hand to hand to the conspirator Councillors, who accepted it. . . ."

and the Commissioner and that Favulli, although favoring confirmation, went along merely to accommodate his colleagues, did not vitiate the evidence that by their presence and acquiescence they joined in the plan and in the solicitation. This evidence was not equally consistent with innocence.

The judge rightly admitted, as to the conspiracy indictment, the evidence of the raising of $15,000 through Benoit and the paying of one sixth of this sum to one of the six Councillors.

(b) *The indictments for soliciting a bribe.*

The Commonwealth specified in a bill of particulars filed in the indictment against Favulli that the person solicited for the bribe was "Foster Furcolo, then Governor . . . . The request was made personally to intermediaries. The intermediary now known . . . to whom such request was made . . . was Daniel J. O'Connell . . . chief secretary to the . . . Governor." The testimony as to the conference of Councillors on February 4, 1960, as stated, tended to show a plan to obtain payment for votes. The jury could have found solicitation of such payment on February 18, as charged, by all the Councillors present, including Favulli and Sullivan. That there was no evidence of particular words spoken by either of these defendants, and that the conference was held in a busy place with numerous people walking in and out, where telephones were ringing, were circumstances to be weighed by the jury, but they were not grounds for a ruling that any of those Councillors present was not taking part in the request then made. That mention was made of $25,000 whereas, if six Councillors were to be paid $5,000 each, a total of $30,000 would be required, of course does not suggest with any force that some Councillor or any particular Councillor was not soliciting.

(c) *The charge; the requests.*

There was no error in the judge's charge or in denial of requests. The charge clearly distinguished between the indictments and the proof applicable to each. The judge carefully confined the jury in their consideration of the

solicitation indictments to the conference with Mr. O'Connell on February 18, 1960. It was not necessary to instruct in terms that finding one defendant guilty did not necessarily require the jury to find another or all others guilty. The judge expressly referred to the testimony of Sullivan and Favulli as qualifying what Mr. O'Connell had testified to and instructed them to weigh that testimony. He reminded them that they had the right to believe everything that a witness had testified to, naming Cronin, O'Connell, Stasiun, Sullivan and Favulli. It was not necessary to repeat for each defendant the appropriate general instructions as to proof beyond a reasonable doubt.

Sullivan, after the charge, took an exception to the judge's remark in the course of it: "I suggest, if the defendants can't control their emotions, I will have to ask them to leave the court room." Colloquy when the exception was taken showed that the judge was referring to the conduct of Favulli over a fifteen or twenty minute period in shaking his head back and forth. We discern no prejudice to any defendant. A display of emotion in one charged with a crime is not unnatural; it is as consistent with innocence as with guilt. If the jurors had not observed the conduct, they knew only that some one or more of the defendants had in an undisclosed way disturbed the decorum of the court room. This, in our view, did not tend to induce a verdict against any defendant otherwise than on the facts and the applicable law. It is beside the point that, as Sullivan points out, each defendant was entitled to be present throughout the trial. G. L. c. 278, § 6 ("during the trial").

(7) *Other points; Favulli's motion for a new trial.*

We have considered all the points assigned or adverted to in the briefs. There was no error in denying the motion for a new trial.

*Judgments affirmed.*

SPIEGEL, J. (dissenting) Mr. Justice Kirk and I cannot agree with the majority opinion. The prejudicial effect of the presence before the grand jury of a number of persons

in addition to the Attorney General transcends in importance the other issues in this case. We feel so strongly about the sanctity and inviolability of proceedings before a grand jury that we confine our dissent to that sole issue. Our thesis is that there was a violation of art. 12 of the Declaration of Rights of the Constitution of the Commonwealth. We base our conclusion on the following testimony given to the trial judge by persons associated with the prosecution.

Mr. Marshall Simonds testified that he was employed by the crime commission on July 29, 1963, "to render legal services" and was still so employed. On January 27, 1964, he was sworn in as a special assistant attorney general. He was present in the grand jury room on six days[1] during the period in which evidence relevant to these indictments was being presented. At no time on those days did he present any evidence to the grand jury.

In his capacity as general counsel for the crime commission he never interviewed any witnesses in connection with the subject matter of these indictments nor did he do any investigation of either the facts or the law, nor did he direct the activities of attorneys or investigators of the crime commission. He did not attend any meetings of the crime commission "wherein any . . . information was elicited concerning the subject matter of the indictments." At no time was he compensated by the crime commission "in connection with the subject matter of these indictments."

His personal records showed that he allocated time to the Attorney General on the days he was in the grand jury room,[2] but at no time did he receive any compensation from the Attorney General.

The total extent of Mr. Simonds' work, either for the Attorney General or the crime commission, except for his presence in the grand jury room in which he did not assist

---

[1] June 26, September 15, 16, October 8, 9, and 13, 1964.

[2] $2\frac{1}{4}$ hours on October 8, $1\frac{1}{4}$ hours on October 9, and $3\frac{1}{4}$ hours on October 13, 1964.

in any way with the presentation of evidence, was summarized by him as follows: "My recollection is that there were probably a half-dozen, maybe more, maybe eight or ten days, occasions on different days between May and October in which I engaged in conversation with one or more members of the staff of the Crime Commission relative to the subject matter that ultimately came down as the indictment now before The Court. And, also, on one or two days in which I engaged in a conversation with Mr. Willcox who was not then on the staff of the Crime Commission relative to these matters, and, very probably, at least one or two days when I made some form of summary report to Mr. Gardner concerning the job allocations of the staff of the Commission; and that would have included a reference to the fact that certain members were working on this investigation that resulted in these indictment[s]. That time that I spent, which I considered to be a part of my supervisory duties as general counsel over the staff of the Commission of that nature, I feel certain I charged to the Crime Commission and was paid for it. Now, I conferred with many of these people on many different subjects. I feel certain the subject matter of these indictments was one of those subjects, but I have no records that would permit me to separate it. My total estimate of the time involved would be not more than over five or six hours involved in all during the four or five-month period."

He also testified that Mr. Harold M. Willcox was presenting the evidence to the grand jury and that Messrs. Robert A. Greeley and Calvin Bartlett were also present in the grand jury room on several of the occasions on which he was present.

Mr. Harold M. Willcox testified that he began working for the crime commission about "the beginning of February, 1963." On May 9, 1963, he was appointed a special assistant attorney general without compensation. On May 13, 1964, his contract with the crime commission was terminated and the following day he became a special assistant attorney general with compensation.

Until May 13, 1964, he was compensated by the crime commission for work he did relating to the subject matter of these indictments, including some preparations he made for his presentations to the grand jury,[3] but not for the time he actually spent before the grand jury. Of the witnesses he interrogated before the grand jury, about twenty-five per cent he "talked to ahead of time and 75 per cent . . . were examined, as far as I was concerned, cold."

Mr. Greeley testified that he was employed by the crime commission as an attorney, starting November 4, 1963, to the present time. On April 23, 1964, he was appointed as a special assistant attorney-general. He was never compensated by the Attorney General's office. He participated in crime commission hearings relating to the indictments. In his capacity as an attorney for the crime commission he interviewed witnesses who were later presented to the grand jury while he was in the grand jury room, and some of whom he himself presented to the grand jury.

He was present in the grand jury room on numerous occasions.[4] He was never compensated by anyone for the time he spent in the grand jury room. On a "substantial number of those days" he was compensated by the crime commission for work outside the grand jury room which related to his presentation to the grand jury. He did a substantial amount of investigating for the crime commission relative to these indictments, during which he had the assistance of the crime commission staff.

On every day that he was present in the grand jury room, except one afternoon, Mr. Willcox was also present. On "a few days" there were three assistant attorneys general present and on "parts of some days" there were four present "for a short time." On October 13, 1964, there were six "Attorneys General" present in the grand jury room simultaneously,[5] while the grand jury were in session.

[3] The presentations he made to the grand jury while he was still being paid only by the crime commission were on April 28, 29, 30, and May 1, 1964.

[4] April 28, 29, 30, May 1, 19, 20, 21, 22, 27, June 24, 25, September 14–18, 21–23, 26, 28–30, October 1, 2, 5–8, and 13, 1964.

[5] Attorney General Brooke, Messrs. Greeley, Willcox, Simonds, Bartlett, and Skinner.

When asked whether at "[a]ny time you saw anybody besides yourself and Mr. Willcox in the Grand Jury room, were these other men interrogating witnesses and presenting evidence, documentary or otherwise?" He answered, "No."[6] But they were "sitting at the same bench that whoever was interrogating the witness was at." On October 13, when six "Attorneys General" were present, Mr. Willcox was the only one interrogating the witness. When asked, "What were the other five doing in there?" he replied, "Sitting and listening, as far as I could observe." Q. "And then five of them don't open their mouth at all?" A. "Only to whisper to someone." Q. "I mean opening their mouth in questioning?" A. "No." Q. "Just sitting there, is that right?" THE JUDGE. "Whispering." MR. SKINNER. "From time to time." Q. "Now, did that last for some period of time, an hour or two hours?" A. "A good hour, anyway."

1. We are here concerned with the " 'right of individual citizens to be secure from an open and public accusation of crime . . . before a probable cause is established by the presentment and indictment of a grand jury . . . [which] is justly regarded as one of the securities to the innocent against hasty, malicious and oppressive public prosecutions, and as one of the ancient immunities and privileges of English liberty.' The above quotation is a declaration . . . that it shall no longer be possible for one or more judges to compel or direct the examination of a witness to be held in open court before the grand jury, should the judges seek to overawe the latter or the witness by the presence of other witnesses or bystanders, or should he or they be of opinion the prosecution is too indulgently or too vindictively conducted." *Commonwealth* v. *Harris,* 231 Mass. 584, 586. The principle of the *Harris* case, prohibiting the appearance before the grand jury of more persons than are absolutely essential to the orderly functioning of the grand jury has been reaffirmed in *Opinion of the Jus-*

---

[6] Later he said that Mr. Bartlett interrogated witnesses "from time to time."

*tices,* 232 Mass. 601, and *Lebowitch, petitioner,* 235 Mass. 357. The purpose of this rule is clear: to prevent the *possibility* that either the members of the grand jury or the witnesses testifying before them will be overawed by the majesty of the State, whatever form it may take.

The appearance of other persons before the grand jury is authorized for specific purposes. The presence of the district attorney, or in an appropriate case the Attorney General, is a concession to the practical necessity of an orderly presentation of evidence which comes to the attention of the public prosecutors, and warrants consideration by the grand jury. An assistant attorney general is authorized to appear in place of the Attorney General for the obvious reason that the Attorney General cannot personally prosecute all of the cases which come to his office. The joint presence of both the Attorney General and his assistant is permitted so as not to deprive the Attorney General of his responsibility to supervise the presentation of cases to the grand jury. The fact that both may be present is not grounded on any assumption that a case may be so complex that two persons are required to present it. It does not follow that any number of assistants may be present merely because the Attorney General and "his assistant" (see *Commonwealth* v. *Harris, supra,* p. 587) are permitted to be in the grand jury room.

Other persons have been permitted to be present on the grounds of absolute necessity. For example, by statutory authority (now G. L. c. 221, § 86), a stenographer, *Commonwealth* v. *Harris, supra;* an interpreter, *Opinion of the Justices, supra,* p. 604; a guard for a "prisoner of desperate character brought on habeas corpus to testify before the grand jury" or an "indispensable attendant for a sick or disabled witness," *Lebowitch, petitioner, supra,* p. 362. As this court stated in the *Lebowitch* case, at page 362, "One purpose of the grand jury in making its investigations and accusations is to ascertain truth. Where that end in its essence cannot be achieved without the presence of more than *one person,* the rule that only *one person* may

be present is not applicable. . . . Such instances, however, rest upon *inherent necessity and not upon convenience.* It is only when some imperative compulsion requires it to prevent a miscarriage of justice or an utter failure of the investigation imposed by law upon the grand jury that more than one stranger at a time may be before the grand jury'' (emphasis supplied).

2. The presence of five assistant attorneys general in the grand jury room violated the rule prohibiting the appearance before the grand jury of more persons than are absolutely essential to the orderly functioning of the grand jury.

The majority say, first, that the presence of the extra assistants was allowed because they were ''duly appointed prosecutors.'' We do not believe that the history or purpose of the exception to the rule that only one person at a time may appear before the grand jury supports the conclusion that any number of persons may appear so long as they are ''duly appointed prosecutors.'' If the majority are focusing on the word ''stranger'' in the *Lebowitch* case, it should be pointed out that anyone not a member of the grand jury is a ''stranger'' and does not cease to be so by being ''duly appointed'' as an assistant attorney general. The Commonwealth should not be permitted to flood the grand jury room with prosecutors any more than it should be permitted to flood the grand jury room with police officers. We therefore disagree with the majority when they say that ''it was not numbers that the court referred to'' in the *Harris* case.

Applying the rule of ''inherent necessity,'' there are no facts in this case which show that the presence of five assistant attorneys general was ''necessary'' by any legitimate definition of the term. However convenient it may have been to have five assistant attorneys general present during the interrogation of the witness, it is obvious that their presence was not an ''inherent necessity'' to ''ascertain truth.'' Indeed, contrary to the majority's contention, there is nothing in this record to show even that their joint

presence in any way contributed to an ''effective presentation of the evidence.'' That is a bare assumption of the majority based on the inability of the defendants to prove otherwise. The only conclusion we can reach on the evidence before us is that the nonparticipating prosecutors were no more than spectators or bystanders.

Even if a case of sufficient complexity would warrant the presence of more than the prosecuting attorney and a single assistant, this case falls far short of that requirement. The indictments were for conspiracy to request and accept a bribe and for requesting and accepting a bribe. This was not a complicated case involving entangled accounts or business records, correspondence and the like.

No matter how much we may try to rationalize the presence of six prosecutors in the grand jury room we have been unable to find a plausible reason for their presence. Even a new and completely inexperienced Attorney General in what obviously was a comparatively simple presentation of evidence would not require the presence of a gallery of assistants. No attorney is permitted to represent a potential defendant and there is no cross-examination. The prosecutor may ask a witness practically any question even though it be irrelevant, and may introduce documents at will. There was no need for six prosecutors to be present in the grand jury room.

The presence of these extra assistants was precisely the type of situation which the long established law of this Commonwealth was designed to prevent. The procedure sanctioned by the majority is an invitation to a prosecutor to appoint any member of the bar, whether he be a police officer, investigator, or nonpracticing attorney, as an assistant, thereupon enabling him to become a spectator in the grand jury room.

3. Perhaps the most startling aspect of the majority opinion is its allocation of the burden of proof. The majority say that six prosecutors was a ''reasonable number'' and that the court would ''assume, as did the judge below, that, unless the facts require another conclusion, the prose-

cutor did not have assistants present for any other purpose than the effective presentation of the evidence. This assumption being applicable, *the burden is not on the Commonwealth to show a necessity, or indeed the reason, for the presence of the prosecutors*" (emphasis supplied).

The assumption has always been to the contrary. The majority reveal not only a surprisingly sanguine attitude toward the motives of the prosecutor, but also ignore the history and purpose of a rule prohibiting *opportunities* for influencing grand jury proceedings. We point out that the actual purposes for which the prosecutor has assistants present are irrelevant. Rather, the focus has always been upon the effect which their presence might have on the grand jury or on a witness testifying before the grand jury. It has always been assumed that the presence of extra persons will have a deleterious effect on the grand jury, regardless of the motives which the Commonwealth may claim to have had in allowing such persons to be present in the grand jury room. The *Lebowitch* case makes clear that this court will *not* assume that the persons which the Commonwealth introduces into the room are there to serve some "inherent necessity" in the ascertainment of truth. Mere convenience is not enough. Even if we should conclude that it was helpful to the prosecution to have five assistants present for an "effective presentation of the evidence" the danger of overawing the grand jury requires a strict rule against such an extravaganza of governmental efficiency.

A defendant in this Commonwealth need not prove actual prejudice if his rights under the Declaration of Rights have been violated by irregular proceedings before the grand jury. "The contention of the Commonwealth that the burden is upon the defendant to show he was injured by action of the grand jury is unsound, because in the nature of things it would be impossible to prove the fact, if true, before the jury trial and because the wrong complained of is the violation of a substantial right guaranteed by the Declaration of Rights, and is not a mere failure of the grand jury to observe technical requirements and formalities."

*Commonwealth* v. *Harris,* 231 Mass. 584, 587. Other juris-
dictions also recognize the danger of requiring the defend-
ant to prove prejudice. ''There must not only be no im-
proper influence or suggestion in the grand jury room, but
. . . *there must be no opportunity therefor.* If the pres-
ence of an unauthorized person in the grand jury room may
be excused, who will set the bounds to the abuse to follow
such a breach of the safeguards which surround the grand
jury?'' (emphasis supplied). *United States* v. *Edgerton,*
80 Fed. 374 (D. Mont.). In *People* v. *Minet,* 296 N. Y. 315,
the court, in holding that the defendant was not required to
show actual prejudice by the presence of unauthorized per-
sons in the grand jury room, stated: ''We think the prac-
tice offers too great a *possibility* for the exercise of undue
influence to be condoned. Approval of it would open the
door to grave abuses and jeopardize safeguards . . . [sur-
rounding] the institution of the grand jury'' (emphasis
supplied).

4. For reasons similar to those set out in point 3 of this
dissent, we are not persuaded by the discussion in the
majority opinion wherein it was concluded that because the
prosecutors ''were requested to leave the room and they all
did so for two separate periods of time . . . warrants the
inference that the grand jurors, at least as to some matter
or matters, made decisions in the absence of the prosecu-
tors'' before returning the indictments. The majority's
reliance on this evidence indicates that they have over-
looked the reason for a rule prohibiting opportunities for
overawing a grand jury. It is extremely difficult to prove
whether a grand jury or just how many members of a grand
jury were influenced by an intrusion of an array of assist-
ant prosecutors.[7] If we adopt the inference of the majority
we must automatically conclude that if a grand jury request
the prosecutors to leave the grand jury room there is no

---

[7] See for example G. L. c. 277, § 13. ''No grand juror shall be allowed to
state or testify in any court in what manner he or any other member of the
jury voted on any question before the grand jury, or what opinion was ex-
pressed by any juror relative thereto. In charging the grand jury, the court
shall remind them of the provisions of this and the preceding sections.''

prejudicial error in permitting a prosecutor to have as many assistants as he may want in a grand jury room at any time. We point out that an equally permissible and more probable inference to be drawn from the grand jury's request is that they had found the presence of the prosecutors to be oppressive, offensive and an interference with the performance of their duties as jurors.

In essence the majority's position is that " [t]he right of individual citizens to be secure from an open and public accusation of crime" is adequately preserved if the grand jury request the prosecutors to leave the room. We regard it as unthinkable that the inviolability of such a fundamental right, which has its roots in the Magna Carta and the Declaration of Rights (Shaw, C.J., in *Jones* v. *Robbins,* 8 Gray, 329, 342–344), should be left to the varying judgments of grand juries. Rather, the established law requires that the number of persons be confined to those whose presence is determined to be an "inherent necessity."

In the present case the majority have not been able to point out that the presence of the several assistant attorneys general was required by "inherent necessity." In fact, they have ignored the rule that requires a showing of "inherent necessity" as a justification for the presence of persons other than the witness. They have not only substituted for the rule of necessity a rule of "convenience," which was specifically rejected in *Lebowitch, petitioner,* 235 Mass. 357, but they have done more. They have placed upon the defendants the burden of showing that they have been injured by the presence of persons whose attendance was not inherently necessary. This was summarily rejected by the court in *Commonwealth* v. *Harris,* 231 Mass. 584. "We think it wise to continue to follow the well settled methods of procedure which were adopted at and have continued since the settlement of this Commonwealth" (*supra,* p. 587).